# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: Grand Jury Subpoenas Dated July 10, 2026, <br><br> THE NEW YORK TIMES COMPANY, JULIAN E. BARNES, ERIC LIPTON, AND ERIC SCHMITT, <br><br> Movants. | UNDER SEAL <br><br><br> Case No. 26 Misc. _____ |

## MEMORANDUM OF LAW IN SUPPORT OF MOVANTS'
## MOTION TO QUASH

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 3

ARGUMENT ....................................................................................................................... 10

I.      Applicable Law ..................................................................................................... 11

      A.      The First Amendment Prohibits the Use of the Grand Jury to Harass or Intimidate the Press ................................................................................. 11

      B.      Compelled Disclosure of Journalists' Confidential Sources Must Overcome a Stringent Showing ............................................................... 12

II.     The Subpoenas Violate the First Amendment Because They Were Issued in Bad Faith to Harass, Intimidate, and Retaliate ............................................................. 16

      A.      Administration Officials Have Expressed Retaliatory Animus Toward The Times and These Journalists Personally ................................................. 16

      B.      The Events Surrounding the Subpoenas Demonstrate Bad Faith ......................... 19

            i. The Government Immediately Issued the Subpoenas .................................. 19

            ii. The Government Made No Attempt to Comply with its Own Rules ........... 19

            iii. The Information in the Articles About Security Concerns Was Widely Known, Readily Observable, and Easily Inferred ................................ 22

III.    The Government Cannot Make the Showing Necessary to Sustain the Subpoenas Under Second Circuit Precedent ...................................................................... 25

CONCLUSION ................................................................................................................... 29

i

# TABLE OF AUTHORITIES

**Cases**

*Baker v. F & F Inv.*, 470 F.2d 778 (2d Cir. 1972) ....................................................12–15

*Branzburg v. Hayes*, 408 U.S. 665 (1972) ........................................................2, 11–16

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ....................................11

*Gonzales v. Nat'l Broad. Co.*, 194 F.3d 29 (2d Cir. 1999) ...............................14, 15, 25

*Gomez v. Nessinger*, No. 1:26-cv-00245 (D.R.I. May 5, 2026) ......................................17

*Gorin v. United States*, 312 U.S. 19 (1941) .................................................................22

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) ........................................................11

*In re: Administrative Subpoena 25-1431-032 to Rhode Island Hospital*, No. 1:26-mc-0007-MSM-AEM (D.R.I. May 14, 2026)..........................................................17

*In re Petroleum Products Antitrust Litigation*, 680 F.2d 5 (2d Cir. 1982) .....................14

*In re Search of E-Mail Account [redacted]@gmail.com Maintained on Computer Servers Operated by Google, Inc.*, No. 1:10-mj-00291-AK-1 (D.D.C. filed Nov. 7, 2011) ..............................................................................................20

*In re the Search of the Real Property and Premises of Hannah Natanson*, No. 1:26-sw-00054-WBP-AJT (E.D. Va. Feb. 24, 2026) ..............................................22

*N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286 (2d Cir. 2012) ............................1

*N.Y. Times Co. v. Dep't of Def.*, 824 F.Supp. 3d 27 (D.D.C. 2026) ................................16

*N.Y. Times Co. v. Dep't of Def.*, No. 26-1690 (PLF), 2026 WL 1872765 (June 30, 2026 D.D.C)..........................................................................................................18

*N.Y. Times Co. v. Gonzales*, 459 F.3d 160 (2d Cir. 2006)..........................3, 15, 16, 19, 25, 27, 28

*N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) .................................................11

*United States v. Abrego Garcia*, No. 3:25-cr-00115 (M.D. Tenn. May 22, 2026).........17

*United States v. Abu-Jihaad*, 630 F.3d 102 (2d Cir. 2010)..........................................22

*United States v. Burke*, 700 F.2d 70 (2d Cir. 1983)........................................2, 12, 14, 26

*United States v. Heine*, 151 F.2d 813 (2d Cir. 1945)..............................................22, 24

*United States v. Hendron*, 820 F.Supp. 715 (E.D.N.Y. 1993) ......................................................25

*United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988) ..................................................22, 23

*United States v. Ocon*, No. 1:26-cr-00039 (D. Wyo. May 15, 2026) ...........................................17

*United States v. R. Enters., Inc.*, 498 U.S. 292 (1991) ...............................................................12

*United States v. Rabbitt*, No. 1:25-cr-00693 (N.D. Ill. May 21, 2026) ........................................17

*United States v. Schulte*, No. 17-CR-548 (JMF), 2022 WL 1639282 (S.D.N.Y. May 24, 2022) .............................................................................................................22, 23

*United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000) ..........................................................23

*United States v. Whitehead*, No. 22 Cr. 692 (LGS), 2024 WL 912039 (S.D.N.Y. Mar. 4, 2024) ...............................................................................................................25

**Statutes**

18 U.S.C. § 793 ...........................................................................................................22, 23

**Regulations**

28 C.F.R. § 50.10 ............................................................................................................19–21

**Other Authorities**

Al Weaver, *Senate GOP weighs safety, legal concerns over Trump Qatar jet gift*, THE HILL (May 12, 2025), https://thehill.com/homenews/senate/5296559-trump-qatar-jet-senate-gop...........................................................................................4

Alleen Graef, *Trump says US 'couldn't build a plane like this' as Qatari-gifted Air Force One embarks on inaugural flight*, CNN (Jul. 1, 2026) https://www.cnn.com/2026/07/01/politics/qatar-air-force-one-trump.....................................23

Arden Farhi & Eleanor Watson, *Trump unveils new Air Force One, a $400 million plan gifted by Qatar*, CBS NEWS (June 19, 2026), https://www.cbsnews.com/news/air-force-one-new-plane-trump-qatar/..............................5, 6

Chris Megerian, Zeke Miller & Bernard Condon, *Will the new Air Force One be secure? Qatar's gift to Trump raises questions*, PBS NEWS (May 13, 2025), https://www.pbs.org/newshour/world/will-the-new-air-force-one-be-secure-qatars-gift-to-trump-raises-questions. .......................................................................4

Devlin Barrett, Glenn Thrush & Maggie Haberman, *White House Directed Patel to Oversee Investigation Involving Times Reporting*, N.Y. TIMES (July 11, 2026), https://www.nytimes.com/2026/07/11/us/politics/white-house-patel-investigation-times.html...............................................................................................8, 19

Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Dec. 23, 2025, at 12:32 AM), https://truthsocial.com/@realDonaldTrump/posts/115767241940653010 ....................16

Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (July 4, 2026 at 1:02 AM), https://www.trumpstruth.org/statuses/39685. ................................................................6

Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (July 8, 2026, 8:42 AM), https://trumpstruth.org/statuses/39893 ........................................................................7

Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (May 11, 2025, 8:42 PM), https://truthsocial.com/@realDonaldTrump/115692843128539904 .........................3

Eric Lipton & Eric Schmitt, *U.S. Formally Accepts Luxury Jet From Qatar for Trump*, N.Y. TIMES (May 21, 2025) ........................................................................5

Intelligence Community Directive 701, *Unauthorized Disclosures of Classified National Security Information* 4–5 (Dec. 22, 2017), https://www.dni.gov/files/documents/ICD/ICD-701-Unauthorized-Disclosures-2017-10-03.pdf...............................................................................20

Joe Gould & Connor O'Brien, *Trump's free plane is not so free*, POLITICO (May 12, 2025), https://www.politico.com/news/2025/05/12/trump-qatar-air-force-one-taxpayer-costs-00342299. .....................................................................3, 23

Jonathan Karl & Katherine Faulders, *Trump administration poised to accept 'palace in the sky' as a gift for Trump from Qatar: Sources*, ABC NEWS (May 11, 2025), https://abcnews.com/Politics/trump-administration-poised-accept-palace-sky-gift-trump/story?id=121680511. ...............................................3

Julia Demaree-Nihkinson, Konstantin Toropin, & Josh Boak, *Retrofitted Qatari jet takes flight as Air Force One for Trump's trip to North Dakota*, ASSOCIATED PRESS (July 2, 2026), https://apnews.com/article/trump-air-force-one-plane-qatar-8eb5da68e95d583b14811f85e62cbcd1 ......................................6, 24

Kash Patel (@FBIDirectorKash), X (July 10, 2026, 11:40 PM), https://x.com/FBIDirectorKash/status/2075726894012723256 ...............................8

Letter from Adam B. Schiff, Sen., U.S. Con, et al. to Steven Stebbins, Inspector Gen., U.S. Dep't of Def. (May 13, 2025), https://www.schiff.senate.gov/wp-content/uploads/2025/05/2025.05.13-Senator-Schiff-Letter-to-DOD-IG.pdf.........................5

Letter from Charles E. Schumer, Sen., U.S. Cong., to Pamela Bondi, Att'y Gen., U.S. Dep't of Just. (May 13, 2025), https://www.democrats.senate.gov/imo/media/doc/leader_schumer_letter_to_bondi_on_placing_hold_on_doj_nominees.pdf........................................................4

Letter from James M. Cole, Deputy Att'y Gen., U.S. Dep't of Just., to Gary Pruitt, President & CEO, *Associated Press* (May 14, 2013), https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/dag-letter-to-ap-president-pruitt.pdf ..............................................................................................20

Letter from Richard Durbin, Sen., U.S. Cong., to Pamela Bondi, Att'y Gen., U.S. Dep't of Just. (May 14, 2025), https://www.judiciary.senate.gov/imo/media/doc/2025-05-14%20Letter%20to%20DOJ%20Qatari%20Plane%20Gift.pdf;..............................................4

Meredith McGraw & Marcus Weisgerber, *Trump Takes Maiden Flight on Qatari-Gifted Air Force One. We Were on Board.*, WALL ST. J. (July 1, 2026), https://www.wsj.com/us-news/air-force-one-qatari-maiden-flight-16bbff04...........................6

Michael Marrow, *Qatari 747 to fly as Trump's Air Force One this summer*, BREAKING DEFENSE (Jan. 22, 2026), https://breakingdefense.com/2026/01/qatari-747-to-fly-as-trumps-air-force-one-this-summer ...............................................................................................................5

Michelle L. Price & Konstantin Toropin, *Trump flies partway home from Turkey in an old Air Force One, not the new Qatari-gifted jet*, ASSOCIATED PRESS (July 8, 2026), https://apnews.com/article/trump-air-force-one-nato-iran-qatar-6cb08dcb613a2d7f77d3b0a143f3b216........................................................................7

Mike Pearl, *How the New, Qatar-Gifted Air Force One Is Different From the Old Ones*, GIZMODO (June 20, 2026), https://gizmodo.com/how-the-new-qatar-gifted-air-force-one-is-different-from-the-old-ones-2000774856 ..........................................24

Natalie Allison, Ellen Nakashima, Dan Lamothe, Derek Hawkins, & Warren P. Strobel, *Trump's gifted Qatari 747 would be a security problem, officials say*, WASH. POST (May 12, 2025) ...............................................................................................3

Peter Charalambous, *Trump Files $15 Billion Defamation Suit Against New York Times, Penguin Random House*, ABC NEWS (Sept. 16, 2025), https://abcnews.com/US/trump-files-15-billion-defamation-suit-new-york/story?id=125619941...............................................................................................16

Press Release, Dep't of Justice, Statement of Deputy Attorney General Todd Blanche on Investigation into Intelligence Leak (Mar. 21, 2025), https://www.justice.gov/opa/pr/statement-deputy-attorney-general-todd-blanche-investigation-intelligence-leak ...................................................................16

Press Release, U.S. Equal Emp. Opportunity Comm'n, *EEOC Sues New York Times for DEI-Related Race and Sex Discrimination* (May 5, 2026), https://www.eeoc.gov/newsroom/eeoc-sues-new-york-times-dei-related-race-and-sex-discrimination...............................................................................................16

Reuters Videos, *Trump switches planes in UK en route to Washington after NATO summit*, YAHOO! NEWS (July 9, 2026), https://www.yahoo.com/news/videos/trump-switches-planes-uk-en-045550133.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAC5_CtsouiDBcjDYX1bc-3XrftltP0gVXcxX2_JEr52pi-8_nnb5Bp4yDCTtBE7xTH7AMYbuypqCY6vXO9vTIp-uQZcAAH2y9dKDFZWAd1p7DKdSw89SkF2-e8J7ISxJ_jkd58vqAvXsYhkHU3yxoTHrODvL9LS19JodfFmiDEEg ....................................7

Secretary of the Air Force Public Affairs, *VC-25B Bridge aircraft arrives at Joint Base Andrews, begins commissioning flights,* U.S. AIR FORCE (June 19, 2026), https://www.af.mil/News/Article-Display/Article/4522274/vc-25b-bridge-aircraft-arrives-at-joint-base-andrews-begins-commissioning-fligh ..................................6, 24

Tyler Pager, Eric Lipton, Adam Goldman, Eric Schmitt & Julian E. Barnes, *New Air Force One Lacks Defensive Countermeasures of Previous Model, Officials Say*, N.Y. TIMES (July 9, 2026)..............................................................................8

Tyler Pager, Julian E. Barnes, Eric Schmitt, & Eric Lipton, *Security Precaution Led Trump to Use Old Air Force One in Leaving Turkey*, N.Y. TIMES (July 8, 2026) ..............................................................................................................7

Valerie Insinna, *How L3Harris transformed a Qatari 747 into a new Air Force One plane before July 4*, BREAKING DEFENSE (June 23, 2026), https://breakingdefense.com/2026/06/how-l3harris-transformed-a-qatari-747-into-a-new-air-force-one-plane-before-july-4/ .......................................................24

**INTRODUCTION**

The New York Times Company ("The Times"), and Julian E. Barnes, Eric Lipton, and Eric Schmitt (the "Journalists"), each a reporter with The Times, by and through counsel, hereby move this Court to quash subpoenas *ad testificandum* summoning the Journalists to testify before a federal grand jury in this District (the "Subpoenas") (Ex. A).

The Subpoenas represent a brazen effort to intimidate the press into abandoning its critical, constitutionally protected role "in securing and fostering our republican system of self-government." *N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 298–299 (2d Cir. 2012) (citations omitted). Less than twenty-four hours after The Times published the second of two articles concerning the Boeing airplane gifted to the President by Qatar, the Department of Justice ("DOJ" or the "Department") dispatched armed federal agents to the Journalists' homes, serving them with the Subpoenas to appear in the grand jury less than three business days later. The Federal Bureau of Investigation ("FBI") Director orchestrated this activity from within the White House, in close coordination with top Administration officials and in response to the President's anger over the reporting.

The Government's actions violate the most basic First Amendment protections for newsgathering activity. They represent the latest salvo in an escalating series of attacks on journalists to intimidate them from engaging in reporting that the Trump Administration openly detests. The record is replete with glaring indications of bad faith: vitriolic statements promising retribution against The Times and its reporters by the very Administration officials who launched the Subpoenas; the abandonment of regularity in the process by which these extraordinary law enforcement tools (and grand jury proceedings more generally) have traditionally been used; and a failure even to attempt to comply with the Department's own governing regulations.

1

The reporting at issue was manifestly in the public interest.  It contributed to the public's knowledge about the workings of the Executive Branch, the President's dealings with foreign nations, and the safety of an aircraft that transports the President and many other public officials, reporters, and guests.  At the same time, much of the information in the articles about which the Government now professes to have national security concerns was already widely known and had been observed, inferred, and described elsewhere.  Every indication supports the conclusion that the Administration issued the Subpoenas because the reporting enraged the President and embarrassed him by resurfacing and reinforcing criticism about his acceptance of a jet from a foreign government and his insistence on quickly retrofitting it for use as Air Force One.  The Subpoenas therefore fail under a straightforward application of *Branzburg v. Hayes*, which prohibits grand jury subpoenas to reporters issued "other than in good faith" and acknowledges that the press is entitled to particular protection from compelled testimony under the First Amendment.  408 U.S. 665, 707 (1972).

In addition to issuing the Subpoenas for impermissible reasons, the Government cannot satisfy the stringent showing necessary in this Circuit to justify the compelled disclosure of a reporter's confidential information.  The Second Circuit has long recognized a privilege that requires the Government to demonstrate in a "clear and specific" way that the information it seeks from a reporter is "highly material and relevant," "necessary or critical to the maintenance of the claim," and "not obtainable from other available sources."  *United States v. Burke*, 700 F.2d 70, 76–77 (2d Cir. 1983) (internal citations omitted).  The Second Circuit has confirmed that scrutiny of media subpoenas seeking disclosure of confidential information is at its apex where, as here, "reporting involves the uncovering of government corruption or misconduct."  *N.Y. Times Co. v.*

*Gonzales* ("*Gonzales*"), 459 F.3d 160, 172 (2d Cir. 2006).  The Subpoenas do not come close to meeting the necessary threshold.

This Court should grant the motion to quash.

## BACKGROUND

In May of 2025, President Trump announced[1] that he was accepting a luxury Boeing 747-8 jumbo jet from the royal family of Qatar valued at approximately $400 million (the "Qatari Jet").[2]  The Qatari Jet was to be donated to the Department of Defense ("DoD") for President Trump's use while in office and then transferred to the Trump presidential library shortly before the end of his term.[3]  Concerns were immediately raised about the ethical implications of accepting a $400 million gift from a foreign government,[4] the costs to American taxpayers of retrofitting a commercial jet to serve as a "flying White House"[5]—with all the necessary communications, security, and support capabilities—and the national security implications of using a foreign-donated aircraft for that purpose.[6]  In particular, national security experts flagged skepticism that

---

[1]   Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (May 11, 2025, 8:42 PM), https://truthsocial.com/@realDonaldTrump/115692843128539904.

[2]   Jonathan Karl & Katherine Faulders, *Trump administration poised to accept 'palace in the sky' as a gift for Trump from Qatar: Sources*, ABC NEWS (May 11, 2025), https://abcnews.com/Politics/trump-administration-poised-accept-palace-sky-gift-trump/story?id=121680511.

[3]   *Id.*

[4]   *Id.*

[5]   Joe Gould & Connor O'Brien, *Trump's free plane is not so free*, POLITICO (May 12, 2025), https://www.politico.com/news/2025/05/12/trump-qatar-air-force-one-taxpayer-costs-00342299.

[6]   Natalie Allison, Ellen Nakashima, Dan Lamothe, Derek Hawkins, & Warren P. Strobel, *Trump's gifted Qatari 747 would be a security problem, officials say*, WASH. POST (May 12, 2025), https://www.washingtonpost.com/national-security/2025/05/12/trump-qatar-747-gift-security/ ("The Air Force would have to 'rip' open and rebuild the Qatari plane — which

3

the Qatari Jet, described as a "palace in the sky" and built with luxury accommodations and finishes, could be brought up to Air Force One's famously rigorous security standards within the short timeframe expected by President Trump.[7]  As PBS reported at the time of the announcement, "[a] former U.S. official briefed on the Air Force One replacement project said that while it would be possible to add some features to the Qatari jet, there was no way to add the full suite of capabilities to the plane on a tight timetable" and that "it would be a risk for presidents to fly on such a jet."[8]

Lawmakers also expressed serious doubts about President Trump's plan because of possible violations of constitutional and statutory limitations on the receipt of gifts from foreign governments and because of the national security concerns inherent in the arrangement.[9]  As one Senator put it, the use of the Qatari Jet as Air Force One is a "grave national security risk."[10]

has been flown for years in service of other countries and individuals — to bring it up to standard, said the official.").

[7]  Chris Megerian, Zeke Miller & Bernard Condon, *Will the new Air Force One be secure? Qatar's gift to Trump raises questions*, PBS NEWS (May 13, 2025), https://www.pbs.org/newshour/world/will-the-new-air-force-one-be-secure-qatars-gift-to-trump-raises-questions.

[8]  *Id.*

[9]  *See, e.g.*, Letter from Richard Durbin, Sen., U.S. Cong., to Pamela Bondi, Att'y Gen., U.S. Dep't of Just. (May 14, 2025),  https://www.judiciary.senate.gov/imo/media/doc/2025-05-14%20Letter%20to%20DOJ%20Qatari%20Plane%20Gift.pdf; Letter from Charles E. Schumer, Sen., U.S. Cong., to Pamela Bondi, Att'y Gen., U.S. Dep't of Just. (May 13, 2025), https://www.democrats.senate.gov/imo/media/doc/leader_schumer_letter_to_bondi_on_placing_hold_on_doj_nominees.pdf.

[10]  Letter from Charles E. Schumer, *supra* note 9; *see also* Al Weaver, *Senate GOP weighs safety, legal concerns over Trump Qatar jet gift*, THE HILL (May 12, 2025), https://thehill.com/homenews/senate/5296559-trump-qatar-jet-senate-gop/ ("Senate Republicans on Monday indicated they have multiple concerns with President Trump

Questions were also raised to DoD regarding "the timeline, if any, that the White House has directed for this aircraft to be ready for the President's use, whether necessary modifications can be made within such a timeframe to meet Air Force One standards, and what risks such a timeline could entail."[11]  The Air Force Secretary admitted that the Qatari-donated plane would require significant security modifications.[12]

   Despite these concerns, President Trump moved forward with the plan to accept the Qatari Jet and to retrofit it so that it would be available for his use the following year.[13]  On June 19, 2026, President Trump unveiled the new Air Force One, describing it as "very unique," the "world's most luxurious plane," and built "at a level that will never be seen again."[14]  The U.S. Air Force released a statement describing the completion of the retrofitting project, noting that "[n]o risk was taken in security, safety or mission communications, but the collective team made trades on some of the less commonly used mission sets that Boeing must deliver to support the

---

potentially being gifted a new luxury jet from Qatar, ranging from safety to legal and ethical worries.").

[11]   Letter from Adam B. Schiff, Sen., U.S. Cong., *et al.* to Steven Stebbins, Inspector Gen., U.S. Dep't of Def. (May 13, 2025), https://www.schiff.senate.gov/wp-content/uploads/2025/05/2025.05.13-Senator-Schiff-Letter-to-DOD-IG.pdf.

[12]   Eric Lipton & Eric Schmitt, *U.S. Formally Accepts Luxury Jet From Qatar for Trump*, N.Y. TIMES (May 21, 2025), https://www.nytimes.com/2025/05/21/us/politics/qatar-plane-trump-air-force-one.html.

[13]   Michael Marrow, *Qatari 747 to fly as Trump's Air Force One this summer*, BREAKING DEFENSE (Jan. 22, 2026), https://breakingdefense.com/2026/01/qatari-747-to-fly-as-trumps-air-force-one-this-summer/.

[14]   Arden Farhi & Eleanor Watson, *Trump unveils new Air Force One, a $400 million plan gifted by Qatar*, CBS NEWS (June 19, 2026), https://www.cbsnews.com/news/air-force-one-new-plane-trump-qatar/.

next 40 years."[15]  The statement thus acknowledged that the Qatari Jet was not outfitted with the same capabilities as either the old Air Force One or the new ones still in development.

When the Qatari Jet was unveiled in June, President Trump announced a flyover of Washington, D.C., in celebration of July 4th on the nation's 250th birthday,[16] set up photo ops of the new jet over Mount Rushmore,[17] and described it as "maybe the greatest commercial plane ever built."[18]

Shortly after the plane's inaugural flights, various news outlets and observers noted that, based on publicly observable information, the security capabilities of the Qatari Jet appeared to differ from those of the old Air Force One.  For example, the *Associated Press* reported that "[t]he compressed timetable set by the president limited the modifications to the plane.  Images of the jet captured since its unveiling and analyzed by the *Associated Press* show that it is not equipped with at least some of the same missile detection and countermeasure systems as the outgoing Cold War-era jets."[19]

---

[15]  Secretary of the Air Force Public Affairs, *VC-25B Bridge aircraft arrives at Joint Base Andrews, begins commissioning flights,* U.S. AIR FORCE (June 19, 2026), https://www.af.mil/News/Article-Display/Article/4522274/vc-25b-bridge-aircraft-arrives-at-joint-base-andrews-begins-commissioning-fligh/.

[16]  Farhi & Watson, *supra* note 14.

[17]  Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (July 4, 2026 at 1:02 AM), https://www.trumpstruth.org/statuses/39685.

[18]  Meredith McGraw & Marcus Weisgerber, *Trump Takes Maiden Flight on Qatari-Gifted Air Force One.  We Were on Board.*, WALL ST. J. (July 1, 2026), https://www.wsj.com/us-news/air-force-one-qatari-maiden-flight-16bbff04

[19]  Julia Demaree-Nihkinson, Konstantin Toropin, & Josh Boak, *Retrofitted Qatari jet takes flight as Air Force One for Trump's trip to North Dakota*, ASSOCIATED PRESS (July 2, 2026), https://apnews.com/article/trump-air-force-one-plane-qatar-8eb5da68e95d583b14811f85e62cbcd1.

On July 6, 2026, President Trump flew on the Qatari Jet to a NATO conference in Ankara, Turkey.[20]  On July 8, 2026, the President announced a mid-trip swap and told the public that he would be departing Turkey in the old Air Force One.[21]  President Trump then flew on the old Air Force One to the United Kingdom, where he boarded the Qatari Jet for his flight back to the United States.[22]

That evening, The Times published a story by the Journalists reporting that President Trump flew out of Turkey on the old Air Force One at the recommendation of the Secret Service because of that agency's concerns about the Qatari Jet's security measures (the "July 8th Article").[23]  The President publicly denied the report, asserting that he flew in the old jet so that the Qatari Jet, which was "magnificent," could stop at U.S. military bases and be shown off to troops.[24]  The White House similarly denied the report, declaring that "the new Air Force One is

---

[20]    Michelle L. Price & Konstantin Toropin, *Trump flies partway home from Turkey in an old Air Force One, not the new Qatari-gifted jet*, ASSOCIATED PRESS (July 8, 2026), https://apnews.com/article/trump-air-force-one-nato-iran-qatar-6cb08dcb613a2d7f77d3b0a143f3b216.

[21]    *Id.*; *see also* Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (July 8, 2026, 8:42 AM), https://trumpstruth.org/statuses/39893.

[22]    Reuters Videos, *Trump switches planes in UK en route to Washington after NATO summit*, YAHOO! NEWS (July 9, 2026), https://www.yahoo.com/news/videos/trump-switches-planes-uk-en-045550133.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAC5_CtsouiDBcjDYX1bc-3XrftltP0gVXcxX2_JEr52pi-8_nnb5Bp4yDCTtBE7xTH7AMYbuypqCY6vXO9vTIp-uQZcAAH2y9dKDFZWAd1p7DKdSw89SkF2-e8J7ISxJ_jkd58vqAvXsYhkHU3yxoTHrODvL9LS19JodfFmiDEEg.

[23]    Tyler Pager, Julian E. Barnes, Eric Schmitt, & Eric Lipton, *Security Precaution Led Trump to Use Old Air Force One in Leaving Turkey*, N.Y. TIMES (July 8, 2026), https://www.nytimes.com/2026/07/08/us/politics/trump-air-force-one-security.html (Ex. F).

[24]    *Id.*

a state-of-the-art aircraft that has been fitted with high-level security protocols that ensure the safety of the president and his staff."[25]

On July 9, 2026, The Times published a second story about the previous day's events and the security limitations of the Qatari Jet.  This article reported that the new Air Force One "lacks the same defensive countermeasures that were security features of the old model, including its advanced antimissile capabilities, according to multiple officials who have been briefed on how the jet was retrofitted" (the "July 9th Article" and, together with the July 8th Article, "the Articles").[26]  The July 9th Article also noted that "[d]ifferent parts of the defensive systems are visible on the old Air Force One, under the wing of the plane and on its tail" but "are not observable in photographs of the new Qatari plane."[27]  Based in part on conversations with "officials who ha[d] been briefed on the retrofitting of the Qatari jet, [and] spoke on the condition of anonymity,"[28] the July 9th Article cast significant doubt on the veracity of the President's denials that security concerns prompted his unplanned use of the old Air Force One.

The next morning, on July 10, 2026, FBI Director Patel was summoned to the White House, where he coordinated a plan with top Administration officials.[29]  Later that day, federal agents

---

[25]   *Id.*

[26]   Tyler Pager, Eric Lipton, Adam Goldman, Eric Schmitt & Julian E. Barnes, *New Air Force One Lacks Defensive Countermeasures of Previous Model, Officials Say*, N.Y. TIMES (July 9, 2026), https://www.nytimes.com/2026/07/09/us/politics/new-air-force-one-defensive-countermeasures.html (Ex. G).

[27]   *Id.*

[28]   *Id.*

[29]   Kash Patel (@FBIDirectorKash), X (July 10, 2026, 11:40 PM), https://x.com/FBIDirectorKash/status/2075726894012723256 ("I was at the White House, true, and the fake news will find out why soon"); Devlin Barrett, Glenn Thrush, & Maggie Haberman, *White House Directed Patel to Oversee Investigation Involving Times Reporting*,

appeared at each of the Journalists' homes and served them with the Subpoenas, compelling them to appear before the grand jury for testimony at 10:00 a.m. on July 15, 2026, less than three business days later. *See* Ex. A.

The Subpoenas contain no information about the investigation, the testimony sought, or the basis for the requirement that testimony be held in less than three business days. *See* Ex. A. All that each subpoena provides is a date and time for appearance and a statement that it relates to an "alleged violation of federal law." *See id*. The Subpoenas are signed only by the Deputy United States Attorney for the Southern District of New York ("SDNY"), not by any Assistant United States Attorney. *See id.*

Undersigned counsel has had several conversations with SDNY attorneys regarding the Subpoenas. Declaration of David A. O'Neil ("O'Neil Decl.") (Ex. B) ¶¶ 6–10. During those conversations, the SDNY attorneys declined to answer whether the Department had followed internal regulations regarding subpoenas to members of the media. O'Neil Decl. ¶ 6. They indicated that they are seeking information to enable the Department to identify the sources for the Articles and requested, as an "initial step," information about the nature of the Journalists' confidential sources, the method and timing of communications with these sources, and the substance of those communications in the form of an attorney proffer, among other things. O'Neil Decl. ¶ 7–8. Undersigned counsel did not agree to provide any such information. O'Neil Decl. ¶ 8.

---

N.Y. TIMES (July 11, 2026), https://www.nytimes.com/2026/07/11/us/politics/white-house-patel-investigation-times.html.

Although the SDNY attorneys agreed to move the Journalists' appearance date to July 20, 2026, they declined to agree to adjourn the grand jury testimony until after this Court rules on this motion to quash.  O'Neil Decl. ¶¶ 9–10.

This motion followed.

**ARGUMENT**

The Subpoenas should be quashed for two independent reasons.  *First*, the record makes clear that they were issued in a bad faith effort to harass and intimidate the Journalists, The Times, and the news media more generally.  The latest attack in this Administration's escalating campaign against the press, the Subpoenas provide striking confirmation that the Department has abandoned any regularity in its use of this investigative tool.  The Subpoenas were orchestrated from within the White House, and they were issued immediately after the Articles were published even though much of the information in the Articles was widely known and discussed elsewhere.  They were not preceded by even the semblance of an effort to comply with internal DOJ policies, to investigate the alleged leaks independently, or to seek the purportedly critical information through alternative means.  The Subpoenas are an end in themselves—an instrument to chill criticism of the Administration—and they conflict both with the law and fundamental First Amendment principles.

*Second*, even putting aside the bad faith that infuses this record, the Subpoenas do not come close to overcoming the robust protections in the Second Circuit against unwarranted demands on reporters to disclose confidential sources.  This Circuit has long recognized a privilege that bars any such demand except upon a stringent showing of need.  That requirement is at its apex in this case because the underlying reporting concerns official misconduct.  Having issued the Subpoenas less than a day after the Articles appeared, preceded by no other investigative steps and in contravention of DOJ's own policies, the Government falls far short of the necessary threshold.

10

I.    **Applicable Law**

A "free press stands as one of the great interpreters between the government and the people." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936). "To allow it to be fettered is to fetter ourselves." *Id.* Investigative newsgathering aimed at exposing official misconduct, particularly when national security is at stake, is especially important to the principle of self-governance that undergirds our constitutional order. "In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy." *N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring). "Only a free and unrestrained press can effectively expose deception in government." *Id.; cf. Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 339 (2010).

Supreme Court and Second Circuit decisions establish two limitations on grand jury subpoenas seeking to compel reporters to disclose confidential sources. First, the law prohibits media subpoenas that are issued in bad faith, including out of retaliatory animus or to intimidate and harass. Second, before proceeding with any subpoena seeking confidential information, the Government must satisfy a three-part test intended to ensure the appropriate accommodation of competing interests.

A.    **The First Amendment Prohibits the Use of the Grand Jury to Harass or Intimidate the Press**

In *Branzburg v. Hayes*, the Supreme Court declined to recognize a "impenetrable constitutional shield" for reporters from the obligation to appear before the grand jury in response to subpoenas seeking their testimony. 408 U.S. at 697. The Court made clear, however, that grand juries "must operate within the limits of the First Amendment." *Id.* at 708. "Nor is it suggested that news gathering does not qualify for First Amendment protection[,]" the Court explained,

11

because "without some protection for seeking out the news, freedom of the press could be eviscerated." *Id.* at 681.

In addition to supporting a balancing test applicable to media subpoenas, *see infra* at I.B, *Branzburg* imposed a clear and brightline rule: "Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources . . . ha[s] no justification." *Branzburg*, *408* U.S. at 707–08. The Constitution prohibits media subpoenas that are "instituted or conducted other than in good faith." *Id.* at 707*; see also id.* at 709 (Powell, J., concurring) (noting that "no harassment of newsmen will be tolerated" and that courts will provide a remedy if the "grand jury investigation is not being conducted in good faith"); *see also United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991) ("Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass."). As a corollary to that rule, law enforcement may not use the power of the grand jury to "annex the news media as an investigative arm of government." *Branzburg*, 408 U.S. at 709 (Powell, J., concurring) (internal quotations omitted).

### B.   Compelled Disclosure of Journalists' Confidential Sources Must Overcome a Stringent Showing

The Second Circuit has long held that reporters have a qualified privilege to refrain from disclosing their confidential sources in both civil and criminal cases. *Burke*, 700 F.2d at 77. This privilege "reflect[s] a paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters, an interest which has always been a principal concern of the First Amendment." *Baker v. F & F Inv.*, 470 F.2d 778, 782 (2d Cir. 1972). "Compelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis." *Id.* "The deterrent effect such disclosure is likely to have upon

12

future . . . investigative reporting . . . threatens freedom of the press and the public's need to be informed." *Id.*

The Circuit's precedent is rooted in the federal common law and the First Amendment principles identified in *Branzburg*. That decision emphasized the First Amendment interests that attach to newsgathering even in the face of grand jury subpoenas. Justice Powell, whose vote was indispensable to the five-Justice majority, wrote separately to make clear the narrow scope of the Court's holding. He explained that the Court's decision did not mean that "newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources." *Branzburg*, 408 U.S. at 709 (Powell, J., concurring). Rather, he explained that an "asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." *Id.* at 710 (Powell, J., concurring).

In the wake of *Branzburg*, federal courts including the Second Circuit have relied on Justice Powell's concurrence to hold that the First Amendment protects journalists from compelled disclosure of their confidential sources even in the absence of bad faith. In *Baker v. F & F Investment*, decided just five months after *Branzburg*, the Second Circuit observed that, "as Mr. Justice Powell noted in [*Branzburg*], instances will arise in which First Amendment values outweigh the duty of a journalist to testify even in the context of a criminal investigation." 470 F.2d at 785. The court reiterated *Branzburg*'s finding that "constitutional rights secured by the First Amendment cannot be infringed absent a 'compelling' or 'paramount' state interest," noting

13

that "[i]t is axiomatic, and a principle fundamental to our constitutional way of life, that where the press remains free so too will a people remain free." *Id.* at 784–85.

The Second Circuit again recognized in *In re Petroleum Products Antitrust Litigation*, 680 F.2d 5, 8 n.9 (2d Cir. 1982), that Justice Powell "cast the deciding vote" in *Branzburg* and that his concurrence is "particularly important in understanding the decision." Applying *Baker*, the court articulated a three-part test for evaluating a demand that journalists disclose their confidential sources: "The law in this Circuit is clear that to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: [1] highly material and relevant, [2] necessary or critical to the maintenance of the claim, and [3] not obtainable from other available sources." 680 F.2d at 7 (citing 470 F.2d at 783–85). Reversing an order of contempt against a publisher for failing to disclose confidential sources, the court found that those seeking disclosure had "failed to explore any alternative means of discovering" the information at issue. *Id.* at 8. In *Gonzales v. Nat'l Broad. Co. ("National Broadcasting Co.")*, the Second Circuit reaffirmed the "stringent test . . . enunciated in *Petroleum Products* for overcoming the qualified privilege" when a journalist's confidential sources are at issue. 194 F.3d 29, 36 (2d Cir. 1999).

In *Burke*, 700 F.2d 70, the Second Circuit held that the reporter's privilege applies in criminal cases. Affirming the decision quashing a subpoena to a news magazine, the court found "no legally-principled reason for drawing a distinction between civil and criminal cases when considering whether the reporter's interest in confidentiality should yield to [another] party's need for probative evidence." *Id.* at 77. "Indeed," the Circuit observed, "the important social interests in the free flow of information that are protected by the reporter's qualified privilege are particularly compelling in criminal cases." *Id.* The court relied in part on *Baker*'s conclusion that

14

*Branzburg* "recognized the need to balance First Amendment values even where a reporter is asked to testify before a grand jury." *Id.* at 77 (citing 470 F.2d at 784–85).

In *New York Times Co. v. Gonzales*, 459 F.3d 160, 169 (2d Cir. 2006), the Second Circuit applied the reporters' privilege framework in the context of a grand jury subpoena. The court noted that the privilege is qualified, not absolute, and that "in particular circumstances 'compelling public interests' might require that the privilege be overcome." *Id.* at 169. The court deemed the privilege overcome in that case based on the court's interpretation of the unique circumstances presented. Adopting the Government's factual claims over The Times's vigorous objection, the court rested its decision on a finding that the reporters "[l]earn[ed] of imminent law enforcement asset freezes/searches and inform[ed] targets of them," thereby engaging in conduct "that may constitute a serious obstruction of justice." *Id.* at 170–71. The court "emphasize[d] that [its] holding is limited to the facts before us, namely the disclosures of upcoming asset freezes/searches and informing the targets of them." *Id.* at 171. By contrast, the Second Circuit explained, "[w]here . . . reporting involves the uncovering of government corruption or misconduct . . . courts can easily find appropriate means of protecting the journalists involved and their sources." *Id.* at 172 (citing *Branzburg*, 408 U.S. at 707–08).

Thus, reporters have a robust qualified privilege not to disclose their confidential sources, including in response to a grand jury subpoena. To overcome this privilege, the Government must satisfy a "stringent" standard, *National Broadcasting Co.*, 194 F.3d at 36, and the privilege is most robust where reporting "involves the uncovering of government corruption or misconduct." *Gonzales*, 459 F.3d at 172.

15

**II.    The Subpoenas Violate the First Amendment Because They Were Issued in Bad Faith to Harass, Intimidate, and Retaliate**

Courts must intervene when there is a showing that a subpoena to a reporter was "instituted or conducted other than in good faith," including because the subpoena reflects "[o]fficial harassment of the press undertaken not for purposes of law enforcement, but to disrupt a reporter's relationship with his news sources." *Branzburg*, 408 U.S. at 707–08; *Gonzales*, 459 F.3d at 172. The Subpoenas fall squarely within this prohibited category.

**A.    Administration Officials Have Expressed Retaliatory Animus Toward The Times and These Journalists Personally**

There is ample basis for concluding that the Subpoenas stem from illegitimate motives, including retaliatory animus toward The Times, the Journalists, their reporting, and their access to individuals with information that the Trump Administration considers embarrassing. To start, the Articles were published in The Times, a publication that has been a particular lightning rod for the President's ire. The President has personally sued The Times seeking $15 billion in damages;[30] his Administration has initiated investigations and lawsuits targeting the publication;[31] The Times has successfully challenged the Administration's restrictions on press access to the DoD;[32] and just last year the President stated:

---

[30]    Peter Charalambous, *Trump Files $15 Billion Defamation Suit Against New York Times, Penguin Random House*, ABC NEWS (Sept. 16, 2025), https://abcnews.com/US/trump-files-15-billion-defamation-suit-new-york/story?id=125619941.

[31]    Press Release, Dep't of Just., Statement of Deputy Attorney General Todd Blanche on Investigation into Intelligence Leak (Mar. 21, 2025), https://www.justice.gov/opa/pr/statement-deputy-attorney-general-todd-blanche-investigation-intelligence-leak; Press Release, U.S. Equal Emp. Opportunity Comm'n, *EEOC Sues New York Times for DEI-Related Race and Sex Discrimination* (May 5, 2026), https://www.eeoc.gov/newsroom/eeoc-sues-new-york-times-dei-related-race-and-sex-discrimination.

[32]    *N.Y. Times Co. v. Dep't of Def.*, 824 F.Supp. 3d 27 (D.D.C. 2026).

> The Failing New York Times, and their lies and purposeful misrepresentations, is a serious threat to the National Security of our Nation. Their Radical Left, Unhinged Behavior, writing FAKE Articles and Opinions in a never ending way, must be dealt with and stopped. THEY ARE A TRUE ENEMY OF THE PEOPLE![33]

This broader context reinforces the Administration's pointed hostility towards the media and The Times in particular. The Subpoenas are part of a concerted and highly public effort by the Executive Branch to deter and punish reporting on matters of national importance that the Administration would prefer to remain hidden. Accompanying this extraordinary pressure campaign on reporters is a serious degradation of the integrity and independence of the prosecutorial function, a phenomenon that has led numerous federal courts to conclude that this Department is no longer entitled to a presumption of regularity in its conduct of grand jury proceedings.[34]

In addition to expressing animus towards The Times, the Administration has personally targeted each of the Journalists who received the Subpoenas. For example, an official in the Office

---

[33] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Dec. 23, 2025, at 12:32 AM), https://truthsocial.com/@realDonaldTrump/posts/115767241940653010.

[34] *See, e.g.*, Hr'g Tr. at 22:11–23:6; 23:23–25, *United States v. Rabbitt*, No. 1:25-cr-00693 (N.D. Ill. May 21, 2026), ECF No. 187 (court has "never seen the types of prosecutorial behavior before a grand jury" and while believing "deeply in the presumption of regularity and that most government attorneys are doing the best they can to do the right thing[,]" "[t]hat trust has been broken[]"); Order Dismissing Indictment Without Prejudice at 9–10, *United States v. Ocon*, No. 1:26-cr-00039 (D. Wyo. May 15, 2026), ECF No. 49 (noting that prosecutors' conduct had "eroded the constitutionally required independence of the grand jury[]"); Memorandum and Order at 1–2, *In re: Administrative Subpoena 25-1431-032 to Rhode Island Hospital*, No. 1:26-mc-0007-MSM-AEM (D.R.I. May 14, 2026), ECF No. 44 (stating "DOJ has proven unworthy [of the prosecutorial authority and discretion it possesses] at every point in this case."); Text Order, *Gomez v. Nessinger*, No. 1:26-cv-00245 (D.R.I. May 5, 2026) (referring prosecutor for disciplinary proceedings over the "decision to withhold highly relevant information and [his] lack of candor"); Memorandum Opinion at 19–20, *United States v. Abrego Garcia*, No. 3:25-cr-00115 (M.D. Tenn. May 22, 2026), ECF No. 312 (expressing serious skepticism about the accuracy of a federal prosecutor's account).

17

of the Director of National Intelligence has attacked Mr. Barnes, who is currently suing the Pentagon over its press access restrictions, asserting that he is part of "the deep state's latest effort to attack this Administration from within with an orchestrated op detached from reality" and stating that "those individuals who engage in such subversive and seditions [sic] acts will rightfully be referred to the Department of Justice." Declaration of Julian E. Barnes ("Barnes Decl.") ¶ 8 (Ex. C). At an event in Washington, D.C., last summer, Sebastian Gorka, a senior official on the National Security Council, refused to answer Mr. Schmitt's questions and said: "You are a disgrace, sir, and you endanger U.S. armed services, so go to hell." Declaration of Eric Schmitt ("Schmitt Decl.") (Ex. D) ¶ 8. The Trump Organization has issued multiple legal demand letters threatening lawsuits over these Journalists' reporting, Barnes Decl. ¶ 9; Schmitt Decl. ¶ 7, including on topics relating to the Trump family's overseas financial interests and entanglements. Declaration of Eric Lipton ("Lipton Decl.") (Ex. E) ¶ 8–9.

Other federal courts have had little difficulty recognizing this record for what it is: "evidence of retaliatory motive [through] myriad statements by Department officials expressing disdain for reporting by The Times." *N.Y. Times Co. v. Dep't of Def.*, No. 26-1690 (PLF), 2026 WL 1872765, at *10 (June 30, 2026 D.D.C). Most recently, in a case brought by The Times and Mr. Barnes, a court found that the Administration "officials' rhetoric demonstrates that they harbored animosity for the plaintiffs because of their protected speech." *Id.* The court further found that the Department's conduct and statements overcame the presumption of regularity— "the presumption that the Department has acted in good faith." *Id.* at 13.

The same conclusion applies here. Considered both in isolation and in the broader context of DOJ's illegitimate use of compulsory process, the Subpoenas carry numerous indicia of retaliation and harassment that render them illegal.

18

### B.    The Events Surrounding the Subpoenas Demonstrate Bad Faith

The sequence of events here leaves no doubt that the predominant, if not exclusive, purpose of the Subpoenas is to harass, intimidate, and retaliate against the Journalists and The Times.

### (i)    *The Government Immediately Issued the Subpoenas*

First, the Government issued the Subpoenas immediately upon the publication of the Articles without conducting any prior investigation.  Within hours of the publication of the July 9th Article, the White House summoned the FBI Director,[35] and the next day, agents were at the Journalists' homes with the Subpoenas.  *See* Lipton Decl. ¶ 3; Schmitt Decl. ¶ 3; Barnes Decl. ¶ 3. In that brief period, the Government plainly did not have time to commence, much less conduct, an investigation of any suspected leak of classified or National Defense Information ("NDI").  In a good-faith grand jury investigation, the decision to subpoena a reporter—especially for confidential source information—is among the very last steps, if it happens at all.  *See, e.g.*, *Gonzales*, 459 F.3d at 171.  Here, it was the first.  The Government's "shoot first, aim later" strategy provides strong indicia that the predominant purpose of the Subpoenas was not to further any ongoing investigation but to harass the Journalists, retaliate against them and The Times for their speech, and chill their ability to report on the Administration.  Unfortunately, the Subpoenas are already having this effect.  Lipton Decl. ¶ 5.

### (ii)    *The Government Made No Attempt to Comply with its Own Rules*

The timing compels the conclusion that the Government did not even try to comply with its own regulations governing media subpoenas.  The applicable regulations, set forth at 28 C.F.R. § 50.10, state that subpoenas seeking information from non-consenting members of the news media are an "extraordinary measure[], not [a] standard investigative practice[.]"  28 C.F.R.

---

[35]    Barrett, Thrush & Haberman, *supra* note 29.

§ 50.10(a)(3). To comply with those regulations between the publication of the Articles and issuance of the Subpoenas, DOJ would have had to receive a crime report from an intelligence community component that had conducted a preliminary inquiry,[36] conclude that an investigation was warranted, open one, take all reasonable steps to obtain the information from non-media sources, brief the Attorney General on the relevant considerations in the policy, and obtain the Attorney General's decision that each consideration in the policy was met—all in a 48-hour period. To state that series of events is to show its implausibility. It is telling that the prosecutors have refused to answer the simple question of whether they complied with these rules. O'Neil Decl. ¶ 6.

There are at least four specific requirements in the media guidelines that DOJ apparently violated. *First*, the regulations provide that the Government should have made "all reasonable attempts to obtain the information from alternative sources." 28 C.F.R. § 50.10(c)(4)(ii). The timing here shows that the Government did the opposite.[37] It has not availed itself of the many investigative techniques available to it—such as issuing subpoenas to non-members of the media, coordinating with government agencies to determine who would have been in a position to disclose

---

[36] *See* Intelligence Community Directive 701, *Unauthorized Disclosures of Classified National Security Information* 4–5 (Dec. 22, 2017), https://www.dni.gov/files/documents/ICD/ICD-701-Unauthorized-Disclosures-2017-10-03.pdf.

[37] The Government's approach here also departs sharply from prior DOJ practice. *See generally* Aff. of Regina B. Reyes in Support of Application for Search Warrant (ECF No. 20-1), *In re Search of E-Mail Account [redacted]@gmail.com Maintained on Computer Servers Operated by Google, Inc.*, No. 1:10-mj-00291-AK-1 (D.D.C. filed Nov. 7, 2011) (noting that before seeking a warrant for a reporter, DOJ had already identified and interviewed the target, reviewed access logs, communications records, computer data, and email accounts); Letter from James M. Cole, Deputy Att'y Gen., U.S. Dep't of Just., to Gary Pruitt, President & CEO, *Associated Press* (May 14, 2013), https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/dag-letter-to-ap-president-pruitt.pdf (before subpoenaing *Associated Press* telephone records, DOJ had conducted more than 550 interviews and reviewed tens of thousands of documents).

the alleged NDI, and conducting searches of government systems. Instead, in a blatant violation of its own policy that it revised only a year ago, DOJ went straight to targeting journalists.

*Second*, according to the regulations, in criminal matters "there should be reasonable grounds to believe, based on public information, or information from sources *other* than the member of the news media who would be the target of the requested compulsory process, that a crime has occurred." 28 C.F.R. § 50.10(c)(4)(i)(A) (emphasis added). DOJ has not cited any basis for the Subpoenas other than the Articles authored by "the member[s] of the news media who [are] the target" of the Subpoenas. *Id.*

*Third*, contrary to the regulations, DOJ made no attempt to negotiate with any of the Journalists before serving them with the Subpoenas. *See* 28 C.F.R. § 50.10(c)(4)(iii)(A) ("The government should . . . pursue[] negotiations with the affected member of the news media, unless the Attorney General determines that such negotiations would pose a substantial threat to the integrity of the investigation, risk grave harm to national security, or present an imminent risk of death or serious bodily harm.").

*Fourth*, the Subpoenas are not, as the regulations require, "narrowly drawn," directed at "material and relevant information regarding a limited subject matter," and confined to "a reasonably limited period of time." 28 C.F.R. § 50.10(c)(4)(v). Indeed, they are the opposite: the Subpoenas are unbounded, encompassing *all* content of *every* conversation with *any* person the Journalists spoke to in connection with the Articles. That sweeping scope is fundamentally at odds with the regulations' requirements.

Undersigned counsel participated in calls with SDNY attorneys that reinforce these policy violations. When asked if DOJ complied with the applicable regulations, the SDNY attorneys responded that they would not engage in a dialogue about compliance. O'Neil Decl. ¶ 6. They

also declined to say whether they had taken any investigative steps other than issuing the Subpoenas.  O'Neil Decl. ¶ 6.

The Government's failure to abide even by its own rules underscores why the Subpoenas should be quashed; it should also "seriously undermin[e] the Court's confidence" that there was any regularity in the conduct surrounding these actions.  Memorandum Opinion and Order at 9–10 (ECF No. 62), *In re the Search of the Real Property and Premises of Hannah Natanson*, No. 1:26-sw-00054-WBP-AJT (E.D. Va. Feb. 24, 2026).

(iii)   ***The Information in the Articles About Security Concerns Was Widely Known, Readily Observable, and Easily Inferred***

The sequence of events set forth above, combined with other facts in the public domain, calls into grave doubt whether the Government is conducting any genuine national security investigation or instead using subpoenas to intimidate reporters from publishing information the Administration considers unflattering.

The Espionage Act criminalizes, *inter alia*, the willful communication of "information relating to the national defense" to a person not entitled to receive it.  18 U.S.C. § 793(d), (e). "[T]he espionage statute has no applicability to the multitude of leaks that pose no conceivable threat to national security, but threaten only to embarrass one or another high government official." *United States v. Morison*, 844 F.2d 1057, 1085 (4th Cir. 1988) (Wilkinson, J., concurring).

Although the term "national defense" is a broad concept, *see Gorin v. United States*, 312 U.S. 19, 28 (1941), courts have limited what may constitute NDI.  Among other requirements, the information at issue must be "closely held."  *See United States v. Abu-Jihaad*, 630 F.3d 102, 136 (2d Cir. 2010) (citing *United States v. Heine*, 151 F.2d 813, 815–17 (2d Cir. 1945) (L. Hand, J.)); *see also United States v. Schulte*, No. 17-CR-548 (JMF), 2022 WL 1639282, at *4 (S.D.N.Y. May 24, 2022) (noting the "requirement that information 'relating to the national defense' must be

22

'closely held' in order to fall within the ambit" of 18 U.S.C. § 793(e), (d)).  "[T]he central issue is the secrecy of the information, which is determined by the government's actions."  *United States v. Squillacote*, 221 F.3d 542, 576–77 (4th Cir. 2000) (emphasis in original); *see also Schulte*, 2022 WL 1639282, at \*5 ("whether information is already public is plainly relevant to the question of whether it is 'closely held' by the Government.").  Courts have also limited NDI to information that is "potentially damaging to the United States or might be useful to an enemy," because "[w]ithout such a limitation on the statute's apparent reach, leaks of information which, though undoubtedly 'related to defense' in some marginal way, threaten only embarrassment to the official guardians of government 'defense' secrets, could lead to criminal convictions."  *Morison*, 844 F.2d at 1086 (Phillips, J., concurring).

The Journalists' work is no doubt unwelcome to President Trump, who has made clear his pride in the Qatari Jet.[38]  The Articles reinforce the many publicly expressed doubts about the wisdom of his decision to use a luxury aircraft gifted from a foreign government as Air Force One and to retrofit it on a highly compressed timeline.  The reporting confirmed that, contrary to the assertions of the President and his aides, the change of planes in Turkey was the result of Secret Service concerns about widely known deficiencies with the Qatari Jet.  It is highly unlikely, however, that the information in the Articles constitutes NDI and therefore doubtful that the Government is conducting a genuine criminal investigation.

As explained above, for over a year, members of Congress and former government officials publicly questioned whether the Qatari Jet has sufficient security measures,[39] and the Air Force's

---

[38]    Alleen Graef, *Trump says US 'couldn't build a plane like this' as Qatari-gifted Air Force One embarks on inaugural flight*, CNN (Jul. 1, 2026) https://www.cnn.com/2026/07/01/politics/qatar-air-force-one-trump.

[39]    *See, e.g.,* Gould & O'Brien, *supra* not 5 ("The aircraft would need to be torn down and rebuilt from the inside out — including overhauling electrical wiring, avionics and power

23

June 19, 2026 public statement admitted that "the collective team made trades on some of the less commonly used mission sets that Boeing must deliver to support the next 40 years."[40]

About a week before the publication of the Articles, the *Associated Press* reported that:

- "The compressed timetable set by the president limited the modifications to the plane. Images of the jet captured since its unveiling and analyzed by the Associated Press show that it is not equipped with at least some of the same missile detection and countermeasure systems as the outgoing Cold War-era jets."

- A senior analyst at an aviation and defense consulting firm stated that, based on the lack of certain security upgrades, "as well as a seemingly smaller number of communications antennas . . . the Qatari jet is better suited to only work as a domestic aircraft."

- The Air Force said that "'several highly complex engineering modifications required for the final (Air Force One aircraft) were intentionally excluded from the [Qatari] aircraft.'"[41]

As these statements illustrate, the absence of certain systems and capabilities was observable on publicly available images of the plane.[42]  Readily observable information from lawfully available images does not constitute NDI.  *Heine*, 151 F.2d 813, 815.

---

systems — to install secure presidential communications, self-defense tech and electromagnetic shielding.").

[40] Secretary of the Air Force Public Affairs, *supra* note 15.

[41] Demaree-Nikhinson, Toropin & Boak, *supra* note 19.

[42] Several other news agencies reported on the differences in the airplanes' capabilities around the same time.  *See, e.g.*, Valerie Insinna, *How L3Harris transformed a Qatari 747 into a new Air Force One plane before July 4*, BREAKING DEFENSE (June 23, 2026), https://breakingdefense.com/2026/06/how-l3harris-transformed-a-qatari-747-into-a-new-air-force-one-plane-before-july-4/ (reporting that "presidential transport aircraft are decked out with a suite of electronic warfare and defensive equipment," but the "shortened modification timeline for the Qatari gift plane required L3Harris personnel to scale back the typical upgrade package" in order to meet Trump's self-imposed July 4 deadline for use); Mike Pearl, *How the New, Qatar-Gifted Air Force One Is Different From the Old Ones*, GIZMODO (June 20, 2026), https://gizmodo.com/how-the-new-qatar-gifted-air-force-one-is-different-from-the-old-ones-2000774856 (reporting that the Qatari Air Force One (a) lacks midair refueling; (b) has no external evidence of certain missile countermeasures; (c) is not shielded

24

**III.    The Government Cannot Make the Showing Necessary to Sustain the Subpoenas Under Second Circuit Precedent**

The Subpoenas also fail for a separate and independent reason: the Government cannot overcome the robust privilege that guards against unwarranted demands on reporters to disclose confidential sources.  Where, as here, the Government seeks confidential information from a reporter, it "must make a 'clear and specific showing' that the information is '[1] highly material and relevant, [2] necessary or critical to the maintenance of the claim, and [3] not obtainable from other available sources.'"  *United States v. Whitehead*, No. 22 Cr. 692 (LGS), 2024 WL 912039, at *1 (S.D.N.Y. Mar. 4, 2024) (quoting *National Broadcasting Co.*, 194 F.3d at 33); *United States v. Hendron*, 820 F.Supp. 715, 718 (E.D.N.Y. 1993) (granting a reporter's motion to quash a subpoena in a criminal trial because there was no "clear and specific showing" that the materials were "necessary or critical").  Those requirements are particularly stringent when the underlying reporting concerns government misconduct.  *See Gonzales*, 459 F.3d at 172.

DOJ cannot demonstrate that the Journalists' testimony is either "highly material and relevant" or "necessary or critical" to any potential case.  "The phrase 'necessary or critical' requires a showing that the claim virtually rises or falls with the admission or exclusion of the proffered evidence.  The test is not merely that the material be helpful or probative, but whether or not the defense of the action may be presented without it."  *Whitehead*, 2024 WL 912039, at *3 (citations omitted).

The record does not support the claim that the Government's ability to pursue an Espionage Act investigation "rises or falls with the admission or exclusion" of the Journalists' grand jury testimony.  It is doubtful that any underlying criminal violation even occurred given the extensive

---

against electromagnetic pulses; and (d) given the minimal changes to the luxurious interior likely lacks "a hardened, multi-layered communications system").

information about the Qatari Jet that was already in the public domain, including official statements and readily observable information. *See supra* II.B.iii.  In any event, the determination of whether the Journalists' testimony is essential to a hypothetical case does not even arise because the Government has not pursued any investigation beyond issuing the Subpoenas.  The Court therefore cannot fairly evaluate what evidence the Government has and has not collected and what the gaps may be.

Nor can the Government make a clear and specific showing that the information it seeks from the Journalists is unobtainable from other sources.  Again, the record on this point is resounding.  If the Government seeks information about what the Journalists knew of the deficiencies in the Qatari Jet, it can obtain that from any number of other sources—including the many experts, officials, and lawmakers who have commented on them long before, and in greater detail than, the Articles.  If the Government wishes to know who provided the Journalists with information about the Qatari Jet, it cannot possibly establish the required showing, having issued the Subpoenas without first conducting any investigation or even endeavoring to comply with internal DOJ regulations.  The question is not whether DOJ can obtain the information *as easily* from other sources, but whether it can obtain the information from other sources *at all*.  A "prediction" that pursuing other sources would not yield evidence "does not insulate" the party seeking the materials from its "duty to exhaust all reasonable alternatives." *Burke*, 700 F.2d at 77 n.8.  The Subpoenas therefore fail at every step of the Second Circuit's binding standard.

The deficiencies in the Subpoenas are perhaps best illustrated by contrasting this case with *Gonzales*, the leading case in which the Second Circuit concluded that the Government overcame the reporters' privilege and could serve grand jury subpoenas seeking confidential information.  In the wake of the September 11, 2001, terrorist attacks, as part of an investigation into the funding

26

of terrorist activities by organizations in the United States, the Government developed a plan to freeze the assets and search the premises of certain foundations. *Gonzales*, 459 F.3d at 162. According to the Government, and the *Gonzales* majority that adopted the Government's factual claims, two reporters learned of these plans, and, on the eve of the Government's actions in December 2001, called the foundations for comment. *Id.* The Government, allegedly believing that these calls endangered the agents executing the searches and alerted the targets—purportedly allowing them to take steps mitigating the effect of the freeze and searches—began a grand jury investigation into the disclosure of its plans to The Times. *Id.*[43]

In August 2002, more than six months after these events, DOJ contacted The Times to request a *voluntary* interview and production of phone records, asserting that the Constitution did not protect the reporters' decision "to provide a tip to the subject of a terrorist fundraising inquiry." *Id.* at 164. The Times declined to cooperate on First Amendment grounds. *Id.* Two years later, in July 2004, DOJ again contacted The Times and requested voluntary cooperation, noting that the investigation involved "extraordinary circumstances" and that, in the absence of cooperation, DOJ would seek The Times's phone records from its telephone service provider. *Id.* In August and September 2004, counsel to The Times communicated with DOJ leadership about the dispute, *id.* at 164–65, and then filed an action to obtain a declaratory judgment that the reporters' privilege prevented enforcement of a subpoena for the reporters' telephone records in the possession of third parties. *Id.* at 165.

---

[43]   As The Times argued vigorously before the district and Circuit courts in *Gonzales*, it does not agree that this is an accurate description of the underlying facts. What matters for present purposes, however, is that the Second Circuit, having accepted the Government's factual claims, based its ruling on those specific facts and circumstances, which diverge sharply from those here.

Although the district court ruled in favor of The Times, the Second Circuit reversed, siding with the Government but "emphasiz[ing] that [its] holding is limited to the facts before [it], namely the disclosures of upcoming asset freezes/searches and informing the targets of them." *Id.* at 171. The court explained that "[t]he government has a compelling interest in maintaining the secrecy of imminent asset freezes or searches lest the targets be informed and spirit away those assets or incriminating evidence" and that the reporters' conduct (allegedly) may have "constitute[d] a serious obstruction of justice." *Id.* at 170.

This case is unlike *Gonzales* in nearly every respect. The reporters in *Gonzales*, according to the majority opinion, allegedly interfered with an ongoing criminal investigation; the Journalists in this case did no such thing. They reported on a matter of significant public concern related to the President's dealings with a foreign nation implicating questions of corruption, conflicts of interest, and *quid pro quo*—as well as the safety of the President, public officials, reporters, and many others who travel on Air Force One. As the Second Circuit in *Gonzales* explained, when reporting "involves the uncovering of government corruption or misconduct," the court "can easily find appropriate means of protecting the journalists involved and their sources." *Id.* at 172.

In *Gonzales*, moreover, the Government did not seek to subpoena the reporters or The Times as a first step or even as a final step in its multiyear investigation. Rather, after pursuing numerous other investigative leads for more than two years and engaging in extensive good faith discussions with The Times and its counsel, the Government sought to serve a grand jury subpoena on The Times's telephone provider. *Gonzales*, 459 F.3d at 164–65.

The events that the *Gonzales* court recited thus demonstrated the Government's effort to seek only information that was truly critical to its investigation, only after exhausting many other avenues, and only through means that were least disruptive to First Amendment interests. The

28

record here shows an abject failure even to attempt fulfillment of the Second Circuit's longstanding requirements.

## CONCLUSION

For the foregoing reasons, this Court should grant The Times's and the Journalists' motion to quash.

Dated: July 15, 2026

Respectfully submitted,

David A. O'Neil*
daoneil@debevoise.com
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue N.W., Suite 500
Washington, D.C. 20004
Tel: (202) 383-8000

*S/ Douglas S. Zolkind*
Douglas S. Zolkind
dzolkind@debevoise.com
Leah W. Rosenberg
lwrosenberg@debevoise.com
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909-6000

Julie A. Edelstein**
jedelstein@wiggin.com
WIGGIN AND DANA LLP
600 Massachusetts Avenue, N.W., Suite 375
Washington, D.C. 20001
Tel: (202) 800-2470

*Counsel for Movants*
*\*Pro hac vice pending.*
*\*\*Pro hac vice forthcoming.*

29

## CERTIFICATE OF SERVICE

I certify that on July 15, 2026, I sent a true and correct copy of the foregoing to counsel for the Government in the U.S. Attorney's Office for the Southern District of New York by electronic mail.

Respectfully submitted,

David A. O'Neil*
daoneil@debevoise.com
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue N.W., Suite 500
Washington, D.C. 20004
Tel: (202) 383-8000

*S/ Douglas S. Zolkind*
Douglas S. Zolkind
dzolkind@debevoise.com
Leah W. Rosenberg
lwrosenberg@debevoise.com
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Tel: (212) 909-6000

Julie A. Edelstein**
jedelstein@wiggin.com
WIGGIN AND DANA LLP
600 Massachusetts Avenue, N.W., Suite 375
Washington, D.C. 20001
Tel: (202) 800-2470

*Counsel for Movants*
**Pro hac vice* pending.
***Pro hac vice* forthcoming.

30