Q7NHINRC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE GRAND JURY SUBPOENAS
DATED JULY 10, 2026,

                                        26 MC 352 (AS)

                                        Oral Argument

------------------------------x

                                        New York, N.Y.
                                        July 23, 2026
                                        2:10 p.m.

Before:

                    HON. ARUN SUBRAMANIAN,

                                        District Judge


                        APPEARANCES


DEBEVOISE & PLIMPTON, LLP (NYC)
        Attorneys for Movants
BY:  DAVID A. O'NEIL
        DOUGLAS S. ZOLKIND
        LEAH WISHNER ROSENBERG
        -and-
WIGGIN AND DANA LLP
BY:  JULIE EDELSTEIN


JAY CLAYTON
        United States Attorney for the
        Southern District of New York
BY:  SEAN BUCKLEY
        MICHAEL MAIMIN
        JASON RICHMAN
        KEVIN SULLIVAN
        Assistant United States Attorneys

(Case called)

MR. O'NEIL:  Good afternoon, Judge Subramanian.  My name is David O'Neil, from Debevoise & Plimpton.  With me at counsel table are Doug Zolkind, Julie Edelstein from Wiggin and Dana, and Leah Rosenberg from Debevoise & Plimpton.  We represent The New York Times Company, the five journalist movants: Julie Barnes, Adam Goldman, Eric Lipton, Tyler Page, and Eric Schmitt.

THE COURT:  Good afternoon.

MR. BUCKLEY:  Good afternoon, your Honor.  Sean Buckley, Michael Maimin, and Jason Richman, on behalf of the government.

THE COURT:  Good afternoon to you as well.

All right.  So I'm going to ask both sides a few questions, and then I'm happy for each side to take whatever time that you need to address the issues raised on the motion.

The first question is for the government. Mr. Buckley, will you be speaking for the government?

MR. BUCKLEY:  Yes, your Honor.

THE COURT:  All right.  Is the government willing to withdraw the subpoenas given its request to hold the motion in abeyance and take further investigative steps?

MR. BUCKLEY:  Your Honor, at this stage we believe that the appropriate measure is to hold them in abeyance while we take those necessary steps.  As noted in our opposition

papers, we are not seeking to enforce or compel testimony at this juncture.  The only relief that we have requested while they're in abeyance is to ensure that the records are properly preserved such that, down the road, if we decide to proceed with compelling the testimony required by the subpoenas, we don't run into a spoliation issue.  The reason for that is the subpoenas themselves were properly issued on July 10.

THE COURT:  Stop you right there.

MR. BUCKLEY:  Sure.

THE COURT:  So the answer to my question is no, the government is not willing to withdraw the subpoenas?

MR. BUCKLEY:  We believe the appropriate measure here is to hold them in abeyance pending further investigation.

THE COURT:  So, again, that's a no, right?

MR. BUCKLEY:  Correct.

THE COURT:  And you agree that to overcome the privilege recognized in *New York Times v. Gonzales*, the government must show that the material sought is not obtainable from other sources, right?

MR. BUCKLEY:  That is one of the three factors set forth and assumed by the court in Gonzales, yes, your Honor.

THE COURT:  All right.  I was quoting your letter when I said that.

MR. BUCKLEY:  Yes.

THE COURT:  Good.  So we're on the same page.

Q7NHINRC

Now, your response brief says, "There are particular investigative steps that the government is seeking to take in the near term that the government anticipates will be material to this Court's assessment of application of any qualified reporter's privilege."  Right, that's something that was in your letter?

MR. BUCKLEY:  That's correct, your Honor.

THE COURT:  All right.  And given that you have not taken those steps yet, doesn't that mean that you necessarily failed the *Gonzales* test because one of the elements of that test is, as you just recognized, that the material must be not obtainable from other sources?

MR. BUCKLEY:  No, your Honor, because at the time the subpoenas were issued, those additional steps were not yet identified.  As the investigation has unfolded, we've identified additional steps, and we are pursuing those steps.

THE COURT:  Right.  So at the present time, you would agree that you cannot satisfy the *Gonzales* test, correct?

MR. BUCKLEY:  With respect to — yes, with respect to that factor of the *Gonzales* test, correct.

THE COURT:  Why doesn't that mean that the motion to quash is granted?  And before you answer that, one question for the movants here.

You would agree that if the motion to quash is granted, that would not prevent the government from issuing new

Q7NHINRC

subpoenas down the road under different circumstances if it thought that that was justified, and of course, at that time the movants here could move to quash those subpoenas.  Am I right?  Are we on the same page there?

MR. O'NEIL:  Your Honor, we think there would be real questions at that time about bad faith, the same bad faith that —

THE COURT:  Oh, I know that you're going to make all those arguments.  It's without prejudice to any arguments that you would make, but there's no contention here that granting the motion to quash these subpoenas would in some way prejudice any future subpoenas that the government might issue if they were lawful and satisfied all the standards?

MR. O'NEIL:  If this Court were to grant the motion to quash, it would not make it impossible for the government to attempt to issue subpoenas again in the future.

THE COURT:  All right.  So, Mr. Buckley, given that you agree that at the current time you cannot satisfy the *Gonzales* test, seems like you've got two options: either we can quash the subpoenas or you could withdraw the subpoenas.  It leads to the same path, which is what the government wants, which is you want to undertake further investigative steps.  You want to come back to the Court, if necessary, to overcome any motion that's made by the movants.  Why isn't that the right outcome here?

MR. BUCKLEY:  One reason, your Honor, is, recognizing the *Gonzales* test, recognizing that we're in the Second Circuit, we would like to preserve the record with respect to the three-factor test.  In particular, there's a circuit split such that if, down the road, a decision were made to challenge that and pursue the circuit split — for example, the Fourth Circuit in the *Sterling* case comes down the other way, and in fact, expressly rejects the three-factor test — so, in part and in view of that, we are not prepared to withdraw the subpoenas in order to —

THE COURT:  I don't understand the preservation argument, because if you were to withdraw the subpoenas, take those further investigative steps, and then let's say that you decided that at some future juncture the subpoenas were warranted based on what you had done, then you would be able to come back, make your application, and press the issues that you want.  And while this Court might be constrained by *Gonzales*, you would certainly be able to either seek review of that decision by the Second Circuit or on further appeal.  So I'm not understanding the preservation argument at this juncture.

MR. BUCKLEY:  The preservation argument, your Honor, would be that if we withdraw on the basis of the *Gonzales* three-factor test, that could be viewed as a concession that that is the appropriate test and limit our ability to argue for *Sterling* or some other circuit's precedent.

Q7NHINRC

THE COURT:  All right.  I'm not really understanding that.  You acknowledge that, in the Second Circuit, *Gonzales* lays out the applicable test, right?

MR. BUCKLEY:  Yes, your Honor.

THE COURT:  So I guess you're saying you're going to go to the Supreme Court and try to get the circuit split resolved, and that's a potential outcome here?

MR. BUCKLEY:  It's certainly a possible outcome, your Honor.  I can't tell you —

THE COURT:  How would you not be able to do that if you decide in some future motion to raise those issues?  I'm telling you right now that I will not understand any withdrawal of your subpoena here to prejudice some argument that you would make in a subsequent application that the *Gonzales* test, if you went all the way up to the Supreme Court, would not apply.  So I'm telling you that.

Look, I'm trying to figure out a practical way to meet all of the parties' concerns here, and the movants, in response to your suggestion of an abeyance, have made a number of arguments as to why that would be improper.  And from your perspective and the Court's perspective, it would also seem to pose a number of logistical issues because you propose an abeyance of two weeks, but, as we all know, investigative steps might take longer than that because you might do one thing, it might lead to another thing.  You might need more time; you

Q7NHINRC

might need less time.  So rather than having an ongoing proceeding where we keep extending the current motion, it would seem that there are two options:  Either, based on what you've said here today, the motion would be quashed or you can withdraw it.

So, given everything that I've told you, what does the government want to do?

MR. BUCKLEY:  Your Honor, the government maintains that they should be held in abeyance, but I recognize all of the Court's comments and, if the Court is inclined to quash them, understand the rationale.

THE COURT:  All right.  The movants in their reply brief have indicated that it would be appropriate for this Court to retain jurisdiction over this proceeding.  Does the government have any objection to that?

MR. BUCKLEY:  I'm sorry, your Honor.  Could you repeat that?

THE COURT:  The movants have indicated that it would be appropriate, in this juncture, for the Court to retain jurisdiction over this proceeding so that, if there's a subsequent motion, we don't have to remake the wheel.  Does the government have any objection to that?

MR. BUCKLEY:  Your Honor, I think if we were to bring subpoenas against the — or directed towards the reporters, I do think it makes sense for the Court to retain jurisdiction over

that, but under the Supreme Court's case in *Williams*, I don't think that extends to jurisdiction over the entirety of the grand jury investigation.  I think it would pertain only to the instant dispute.

THE COURT:  So it would apply to the reporters or any information, meaning business records or communications records, relating to the reporters, fair?

MR. BUCKLEY:  Correct, Judge.

THE COURT:  All right.  And do the movants agree that that's correct and appropriate given the Supreme Court case law cited by the government?

MR. O'NEIL:  Your Honor, we do, as we argued in our reply brief, believe it's appropriate for the Court to retain jurisdiction.  Frankly, given the government's conduct in this case, we do not have confidence that any other investigative steps that the government may take might not impact our clients.  So we would ask that the Court retain jurisdiction over the grand jury proceeding as a whole.

THE COURT:  Are you familiar with the case cited by the government?

MR. O'NEIL:  Your Honor, I am not.

THE COURT:  All right.  So we can have some — I'll give you a chance to respond after today's proceeding because the government, obviously, did not have an opportunity to respond to your reply submission, and so I think it's fair for

us to take up that issue to make sure that we're handling things in the appropriate way.

But at least with respect to the current slate of subpoenas, or any subpoenas that are directed to these parties, it seems like we are all in agreement that this Court would retain jurisdiction.

MR. O'NEIL:  That's correct, your Honor.

THE COURT:  So that's what we will do.

All right.  So, Mr. Buckley, are you in charge of this investigation?

MR. BUCKLEY:  I am overseeing this investigation, yes, Judge.

THE COURT:  All right.  Let me take a step back because something you said just reminded me.

You had indicated that when the subpoenas were issued, the investigative steps that you are currently undertaking had not been identified.  What do you mean by that?

MR. BUCKLEY:  Your Honor, as we set forth in our opposition papers, given the national security concerns and the rapidity with which things were moving on July 10, the subpoenas were appropriately issued pursuant to the law and regulations with the Department of Justice and were authorized by the Acting Attorney General.

In the course of further investigation, without going into much detail in violation of Rule 6 or compromising our

ongoing investigation, we have focused on specific

investigative steps that were not immediately —

THE COURT:  All right.  Let me stop you right there.

You said that you're overseeing this investigation, right?

MR. BUCKLEY:  Yes, Judge.

THE COURT:  And that was true as of July 10?

MR. BUCKLEY:  Yes, Judge.

THE COURT:  That's been true since the beginning of this investigation, fair?

MR. BUCKLEY:  That's correct, Judge.

THE COURT:  All right.  And so you had indicated that, because of the need to get the subpoenas out, there were certain steps that weren't taken.  Doesn't that turn the law and the regulations on their head?  Because doesn't the law and the regulations, from *Gonzales* all the way to the government's own regulations and policy, indicate that subpoenas are the last step, not the first step but the last step?  And you would be aware of that.  I mean, you were aware of the regulations as of July 10, correct?

MR. BUCKLEY:  Yes.

THE COURT:  OK.  So when you say that there was a need to get the subpoenas out, I don't understand that, because it would have seemed that the first step would be to identify what kinds of investigative measures could be taken by the

Q7NHINRC

government that would not implicate the profound First Amendment and free press issues that have now been raised by the movants.  So maybe you could help me with that.

MR. BUCKLEY:  Sure, Judge, to the extent I can in open court —

THE COURT:  You keep saying "to the extent I can," but I'm just asking you, am I wrong that the regulations and cases like *Gonzales* say that subpoenas issued to reporters and for the reporter's records are not the first thing you do, they are the last thing you do?  That is the reason why not obtainable from other sources is part of the *Gonzales* test.  It's the reason why in the regulation it specifically says that before you seek a subpoena, you need to make "all reasonable attempts to obtain the information from alternative sources."  It's not a matter of classified or Rule 6 information.  It's a matter of just complying — basic compliance with the law.

MR. BUCKLEY:  Respectfully, Judge, with regard to the regulations, there is an exception to the regulation that you are referring to, and that exception was triggered.  So we're not in violation.

THE COURT:  And that exception is when disclosure — well, why don't you tell me what the exception is that you're relying on.

MR. BUCKLEY:  The exception, your Honor, is — let me get the subparagraph right — 28 CFR Section 50.10(c)(4)(iv).

Q7NHINRC

THE COURT:  Explain to me — I'm looking at the text of (c)(4).  This is the provision that starts "In investigations of unauthorized disclosures of national defense information"?

MR. BUCKLEY:  Correct, your Honor.

THE COURT:  How is this an exception to the basic rule that's literally two provisions above this that says, "The government should have made all reasonable attempts to obtain the information, communications records, or business records from alternative sources"?  How is this an exception?  Point me to the language in this provision that says it's an exception.

MR. BUCKLEY:  I think the language is clear that if —

THE COURT:  Which language is clear that it's an exception?

MR. BUCKLEY:  (iv).

THE COURT:  No, which language within this provision is clear that it's an exception to the rule that's stated two provisions above this that says, "The government should have made all reasonable attempts to obtain the information, communication records, or business records from alternative sources"?  Maybe I'm missing it.  You're familiar with the regulations, so I just want to see where that is where it says except where it's in this category, then subpoenas are the first thing you do, and you don't do anything else.  You go right to the subpoenas, and you don't try to investigate otherwise, as *Gonzales* and the regulations otherwise provide.

Q7NHINRC

Where is that language here in (iv)?

MR. BUCKLEY:  I would distinguish the language "should" in Section (4) from the language "must" in Section (c)(1) through (3).  "Should" is advisory.  And if the Attorney General authorizes the issuance of these subpoenas, it's not a violation of the rule.

THE COURT:  All right.  But you can't point me to any language within (iv) that says that, in these situations, there need not be any attempt to obtain information from alternative sources, right?  You cannot point me to any language in this provision?  I'm just trying to make sure that I'm not missing anything, because you've studied these more than I have, right, so that's what I'm trying to figure out.  You cannot point me —

MR. BUCKLEY:  I'm not sure that's true.  Sorry, I was just trying to process your question.

THE COURT:  No, I understand.  I understand.

Is there any language you want me to focus on in this provision that indicates that, in these types of cases, there need not be any attempt to seek information from other sources?

MR. BUCKLEY:  Respectfully, Judge, I think it is clear on the face of the regulation.

THE COURT:  Which part of it?

MR. BUCKLEY:  The fact that it's a consideration that the Attorney General can authorize separate and apart from the language "must" in Sections (c)(1) through (3).  This is

Q7NHINRC

"should."  And if the Attorney General authorizes it, in spite of that provision not necessarily being addressed, it's still authorized and covered under the policy.

THE COURT:  All right.  And this is why, I suppose, in your briefing you note that "Any subpoenas served for a phone number not used by one of the movants was a result of information in a law enforcement database indicating that the phone number was associated with the movant."  That's one of the thins that you had noted, right?

MR. BUCKLEY:  Correct, Judge.

THE COURT:  And so I suppose you're saying that, because of the nature of this investigation, that is why, when these subpoenas were issued, there was no further attempt to figure out that three of the phone numbers corresponded to one of the journalist's mother and two of the journalists' spouses. That's your position?

MR. BUCKLEY:  That was an error, Judge, we which own. I'm not going to dispute that that was an error.  It was unintentional.  It was a consequence of trying to move quickly. And a public source database incorrectly indicated to us that that was associated with a subject.

THE COURT:  Right.  But how is it an error based on what you're arguing?  You're saying that the government can — in this type of case, they should just go out and get subpoenas, right?  Pursuant to (iv) here, that they can just do

Q7NHINRC

this, and they don't need to check that information.

So why are you now saying it's an error?  It seems like you're —

MR. BUCKLEY:  Respectfully, Judge, that's not at all what I'm saying.

THE COURT:  I just want to be clear.

MR. BUCKLEY:  I'm not saying this permits the government *carte blanche* to issue subpoenas.  They need to be in furtherance of the policy, in furtherance of an investigation into unauthorized disclosure of NDI.  The fact that inadvertently a family member or family members' phone numbers were subpoenaed was a mistake.  It was not in furtherance of the investigation.

THE COURT:  All right.  Switching gears for a second, we'll provide the movants an opportunity to respond to these points.

Now, you are aware that, in the movants' submissions, they've noted that in the July 2 Associated Press article and other public disclosures before July 8, that there had been reporting on the defensive capabilities of the new Air Force One, right?  That's in the movants' papers.  They talk about some of those articles and disclosures, right?

MR. BUCKLEY:  Correct, Judge.

THE COURT:  OK.  So without getting into anything classified, what I'm trying to figure out is, in the July 8 and

Q7NHINRC

July 9 articles, what is it specifically that gave the government concern, just so I can understand the particular text of the articles that raised the eyebrows of the government given these prior articles and disclosures that had addressed the basic issue of the defensive capabilities of the aircraft?

MR. BUCKLEY:  I think if you compare the articles against the July 8 and July 9 article, they don't reference sources currently employed by the government confirming this information.

THE COURT:  All right.  So that's it?  That's what I want to understand.

MR. BUCKLEY:  Yes, Judge.

THE COURT:  It's the fact that there's reference to sources that have relayed certain information.  That's what the government was concerned with in the July 8 and 9 articles?

MR. BUCKLEY:  Yes, Judge.

THE COURT:  All right.  OK.  Very good.

Now, the reporter subpoenas were served beginning on July 10.  Is that correct?

MR. BUCKLEY:  Yes, your Honor.

THE COURT:  And you were involved in the investigation at that time?

MR. BUCKLEY:  Yes, Judge.

THE COURT:  All right.  Now, the movants have indicated that between July 10 and July 14, there were

Q7NHINRC

conversations between counsel for the movants and the

government.  Were you part of those communications?

MR. BUCKLEY:  I was, your Honor.

THE COURT:  And do you recall specifically when they

began?  Was it on July 10?

MR. BUCKLEY:  They began on the morning of July 11.

The government made affirmative outreach to the New York Times,

and then in response to that outreach, we received a call from

counsel at Debevoise.  And it was that morning, July 11.

THE COURT:  All right.  Very good.

And on July 11, the New York Times had published a

story on the investigation, correct?

MR. BUCKLEY:  I believe that's correct, yes, Judge.

THE COURT:  And in fact, in that article, a Justice

Department spokesperson is quoted as saying, "Reporters are not

the targets.  Those leaking classified information are,"

correct?

MR. BUCKLEY:  That is 100 percent correct, yes, Judge.

And in that vein and consistent with that

representation, were this to proceed, we are prepared to

consider immunizing the reporters in connection with these

leaks.

THE COURT:  OK.  So did you review Mr. Sullivan's

July 14 affirmation in support of an application for a

nondisclosure order relating to one of the phone provider

Q7NHINRC

subpoenas at issue here before it was submitted to a judge in this court?

MR. BUCKLEY:  I did not personally review it beforehand, your Honor.

THE COURT:  And is Mr. Sullivan here?

MR. BUCKLEY:  He is, Judge.

THE COURT:  All right.  Where is he?

MR. BUCKLEY:  He's in the gallery.

THE COURT:  Why?  I mean, he's on — his name is on all the pleadings here.  So why is he in the gallery?

You can come up.  We have extra chairs here.

MR. BUCKLEY:  OK.

THE COURT:  Good afternoon, Mr. Sullivan.

MR. SULLIVAN:  Good afternoon.

THE COURT:  Mr. Sullivan, when you affirmed in your July 14 application to a judge in this court, under penalty of perjury, that the investigation was not public, that was false, correct?

MR. SULLIVAN:  I think, your Honor, the wording was imprecise.  The full scope of the investigation was not public. Our inquiry as to the identifier put before the judge for which we were seeking a subpoena was, of course, not public.

But I do acknowledge, your Honor, that the department issued a statement on January — on July 11 acknowledging the existence of an investigation.

Q7NHINRC

THE COURT:  And in the application — I mean, just so we're all on the same page, the application did not refer to the specific investigation.  It didn't tell the judge what the specific investigation was or that it related to reporters or that it involved the New York Times — none of that, right?

MR. SULLIVAN:  Correct, your Honor.

THE COURT:  All right.  So the judge receiving the application — hold on — the judge receiving the application would not have known that this related to the subject of the July 11 article, right?  There would be no way for the judge to have known that.

MR. SULLIVAN:  Correct, your Honor.

THE COURT:  But then you said in your affirmation, "The attached subpoena relates to an ongoing criminal investigation that is neither public nor known to all the targets of the investigation," and that was not correct, right?

MR. SULLIVAN:  So, with respect to the first sentence, not public, I acknowledge that's not correct.  We should have been more precise.  The full scope of the investigation was not public.

As to the targets, your Honor, as the department has acknowledged, the reporters are not targets of the investigation, and so the investigation is not known to the targets, those being specific individuals that allegedly disseminated classified or national defense information.

Q7NHINRC

THE COURT:  Is there a reason why the application didn't inform the judge that the application related to an investigation involving reporters?

MR. SULLIVAN:  Judge, it was an oversight on the government's part, we concluded later in the week, about disclosing the phone provider subpoenas.  That was the result of legal research being undertaken, and so at the time that that application was submitted, it was an oversight, your Honor.

THE COURT:  Wouldn't it have been relevant to the judge's determination whether nondisclosure was appropriate to know that not only had there been public reporting about the investigation as early as July 11, but that the reporters, the owners of the accounts, had actually received the information on July 10 — I mean, received the subpoenas on July 10?  Wouldn't that have been relevant information for the judge?

MR. SULLIVAN:  The testimonial subpoenas?  Yes, your Honor, in hindsight, that should have been in the application.

THE COURT:  Right.  So why wasn't it included?

MR. SULLIVAN:  As I said, your Honor, it was an oversight.  In terms of the Second Circuit case law that extends the privilege to third-party records, we were still doing the necessary research.  We did come to the conclusion later in the week about disclosing these third-party phone provider subpoenas to counsel for The Times, and we did so.

Q7NHINRC

THE COURT:  This isn't about the privilege.  We're going to get to that next.  This isn't about that.  It's about the fact that in the application you affirmed that nondisclosure was warranted because there is reason to believe that notification of the existence of the subpoena will seriously jeopardize the investigation, including by "giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates."  And how is that justified, given that the government was in active discussions with the movants, given that the investigation had been publicly reported and everything else that the judge who fielded the application was not told about?

MR. SULLIVAN:  So specifically, your Honor, targets, as it's referred to in that paragraph —

THE COURT:  No, I understand what the targets are.  I understand that.

What I'm saying is when you're trying to justify nondisclosure, but the owners of the accounts are already aware of the investigation and, in fact, the investigation has already been made public in the newspaper, isn't that relevant information that a judge would have wanted to know when deciding whether nondisclosure is warranted given the factors that the Court is required to consider?

MR. SULLIVAN:  Yes, your Honor, it's relevant.  Our

Q7NHINRC

nondisclosure order, as your Honor is aware, they apply not only to the account users but to the public at large.  But your Honor is correct as to the account user, that would be relevant.

THE COURT:  All right.  So you're still working on this investigation?

MR. SULLIVAN:  Yes, your Honor.

THE COURT:  All right.  So are you going to do this again?

MR. SULLIVAN:  No, your Honor, absolutely not.

THE COURT:  All right.  The affirmation goes on to say that the circumstances justifying the order "will continue for at least the next one year."

What was the basis for that, given the fact that in real time you were having active discussions with the movants, with the journalists, there was public reporting all over the place about this investigation?  Again, what was the basis for seeking nondisclosure for a period of one year?

MR. SULLIVAN:  So, again, your Honor, the nondisclosure order sought, it applies not only to the account user but to the broader public as well.  So in an investigation involving the dissemination of classified or NDI, those investigations can certainly last longer than a year, and so that's why the circumstances would justify, certainly, nondisclosure to the public of the existence of what we were

Q7NHINRC

seeking.

THE COURT: Right. But the order applied to nondisclosure to anyone, right, including the owners?

MR. SULLIVAN: Yes. Yes, your Honor.

THE COURT: And that was not justified, correct?

MR. SULLIVAN: Yes, your Honor, with respect to the account user, there should have been a distinction made there, certainly.

THE COURT: I guess, Mr. Buckley, I'll turn it back to you. Maybe you can help me out.

Look, when you see something like this, if this were a civil proceeding, then what I would normally do is say, you know — ask the party to show cause why sanctions shouldn't issue or steps shouldn't be taken given, at the very least, the incorrect statements and omissions that were made under penalty of perjury in a filing made to a court. So maybe you can help me understand why it was benign in nature, and so would not require any further steps, whether there are steps that you have instituted moving forward or it was an innocent mistake because you've obviously looked into this. So I'll let you respond.

MR. BUCKLEY: Yes, your Honor. And we addressed this in our opposition paper. I believe it was footnote 5, but I'm not —

THE COURT: Yeah, by saying that it was in footnote 5,

Q7NHINRC

that was not sufficient, so I'm giving you an opportunity now to give it the attention that it deserves.

MR. BUCKLEY:  Yes, Judge.

So it was an inadvertent error.  We have conferred internally, discussed it, understand what occurred, and we will take steps to ensure that it doesn't occur again.  The inadvertent failure to disclose to the Court the information about the fact that the investigation itself became public, we recognize that that should have been addressed, and we will ensure that that is appropriately addressed going forward.

THE COURT:  All right.  As Mr. Sullivan had alluded to on July 17, the government had indicated that in light of "additional case law that the government identified," the government determined that it was "appropriate to alert counsel to the phone provider's subpoenas."

So what was the additional case law?

MR. BUCKLEY:  It was the case law that indicates that the account holders could have standing to challenge and move to quash the subpoena with respect to their accounts.

THE COURT:  Right.  That's *Gonzales*, right?

MR. BUCKLEY:  Yes.

THE COURT:  Were you unaware of *Gonzales* prior to July 17?

MR. BUCKLEY:  It is not that we were unaware of *Gonzales*.  We were unaware of that aspect of *Gonzales*, and it

was upon focusing more carefully on it that we saw it.

Again, Judge, this was an inadvertent error while a lot of moving parts were occurring. Nobody was looking to pull a fast one on the court or anybody else. And as soon as we recognized that error, we tried to rectify it in what we thought was the only appropriate way, which was providing notice to the movants so that they could add this to their motion to quash.

THE COURT: All right. So you personally were not aware that, in the leading case on the reporter's privilege, that the court had not made very clear that the privilege extended to records of this very kind in the hands of third-party providers prior to July 17?

MR. BUCKLEY: At that time I was not, your Honor.

THE COURT: And why was it an issue of case law to — well, let me put it this way: Prior to July 17, you were familiar with the DOJ regulation that we've been discussing concerning the policy that it entertains with respect to subpoenas of this kind, right?

MR. BUCKLEY: Yes, Judge.

THE COURT: All right. So don't the department's own regulations in 28 CFR 50.10(e) require advance disclosure of subpoenas of this kind absent particular exceptions? (E)(1)(i) says, "When the Attorney General has authorized the use of a subpoena, court order, or warrant to obtain from a third party

communications records or business records of a member of the news media, the affected member of the news media shall be given reasonable and timely notice of the Attorney General's determination before the use of the subpoena, court order, or warrant. . ."  So why was it an issue of *Gonzales* at all?

MR. BUCKLEY:  Judge, there's again an exception to that contained within the regulation itself that provides that if the Attorney General authorizes it, you don't need to disclose it, and —

THE COURT:  (iv), that's the provision that we were previously addressing?

MR. BUCKLEY:  No, Judge.  It's the second half of the provision you were just reading, ". . .unless the Attorney General determines that, for compelling reasons, such notice would pose a substantial threat to the integrity of the investigation, risk grave harm to national security, or present an imminent risk of death or serious bodily harm."

THE COURT:  And you're saying that determination was made?

MR. BUCKLEY:  Your Honor, I can't get into that in public.

THE COURT:  OK.  How could that possibly — well, it doesn't matter who made the determination.  How could it possibly be true or warranted in these circumstances given that, as of July 10, the reporters, the owners of the accounts,

had been subpoenaed — meaning that they had already been subpoenaed — and by July 11 the investigation was public?

So even if some kind of determination had been made, how could it possibly be warranted under these circumstances, given everything that we've discussed, given that it was already — the reporters already knew that they had been subpoenaed?  And so, under those circumstances, I'm just not understanding how this exception would apply.

MR. BUCKLEY:  Because those were subpoenas, your Honor, that didn't identify particular numbers, email accounts, or otherwise that would potentially alert members of the public, leakers or others, as to the various facilities that were being investigated.

THE COURT:  Right.  But we're not talking about disclosure to the public.  We're talking about disclosure to the reporters, that's it.  So why wasn't it required, under the policies here, for the government to tell the reporters — and you could say it's under seal; don't disclose it to other people — but to tell the reporters that you were planning on subpoenaing their communications records?

MR. BUCKLEY:  Because the exception does not require advance notice.

THE COURT:  Right.  But I'm saying how does the exception apply under these circumstances, given that the reporters had already been subpoenaed and the investigation had

Q7NHINRC

been made public and the Justice Department had, on July 11, made a statement about it?

So, under those circumstances, how could the exception apply?  Why wasn't it the appropriate step to take — and, look, this might have been, in hindsight, yeah, maybe we should have done it.  I'm just trying to nail this down.

MR. BUCKLEY:  I think we've been pretty clear that, in hindsight, yes, we should have done it, and when we've recognized it, we did do it.

THE COURT:  So you're saying that, at least from your perspective — it doesn't matter who made the determination otherwise — but from your perspective, as of July 10, you did not believe that this regulation applied, meaning you thought that this fit into the exception and no advance disclosure was necessary to the reporters — you personally?

MR. BUCKLEY:  Judge, like I said, I personally did not review that nondisclosure, but, yes, I think that's right.

THE COURT:  How did you not review the nondisclosure if you were overseeing the investigation?

MR. BUCKLEY:  Because I don't review every piece of paper, Judge.  There's multiple layers involved in the review of documents and filings.

THE COURT:  What about the provisions of the regulations that require negotiations and things of that nature?  Same answer?

Q7NHINRC

MR. BUCKLEY:  Same answer, Judge.

THE COURT:  I mean, help me understand here, because you're saying that you don't want to withdraw these subpoenas, but it seems like the inadvertent errors and the "in hindsight we should have done things differently," these things are piling up.  So, under these circumstances, I mean, are you still unwilling to withdraw these subpoenas for the reasons you've previously indicated?

MR. BUCKLEY:  Your Honor, I guess what I am struggling with is I don't understand the difference between us affirmatively withdrawing them and the Court quashing them.  If we are holding them in abeyance, I don't believe there's any prejudice to the reporters.  We're holding them in abeyance so that everybody is aware that, as the investigation proceeds, we still may find ourselves in a position of requiring necessary testimony from the reporters, consistent with *Gonzales* and other precedents.

THE COURT:  All right.  Now, you just mentioned that the subpoenas to the reporters were for testimony as opposed to documents, right?

MR. BUCKLEY:  That's correct, Judge.

THE COURT:  All right.  But previously at this hearing, you had said — you had referred to document preservation obligations, and in your response letter you also referred to this in footnote 1.  Given that the subpoenas were

Q7NHINRC

solely for testimony, what documents are you referring to?

MR. BUCKLEY:  The general principle, your Honor, that once you are aware of an ongoing criminal investigation, you have an obligation to preserve records relevant to that investigation.

THE COURT:  And the subpoenas, you would agree, don't actually say what the nature of the investigation is, right?

MR. BUCKLEY:  That's correct, Judge.

THE COURT:  So you're saying that based on the conversations that the government had with counsel for the movants, that that defines the scope of what documents would need to be maintained?

MR. BUCKLEY:  Your Honor, I think, as an attorney, if my client received a subpoena regarding an ongoing criminal investigation, regardless of whether it specifically called for the production of documents, I would instruct my client to preserve those documents.

THE COURT:  Yeah, but how would they know what the scope of the retention obligation that you refer to is?  I mean, how would they know what the scope of that is?  Meaning — let me give you an example:  What about time frame, individuals, forms of communication?  These are usually things that are made pretty explicit.  And so having no specificity as to any of these things, how would the movants know what their document retention obligations are?

Q7NHINRC

MR. BUCKLEY:  We had a conversation with counsel about this.

THE COURT:  All right.  What's the legal basis, what's the case or authority, for this document preservation obligation?

MR. BUCKLEY:  I don't have one in front of me, Judge. I'm happy to submit something if that would be helpful to the Court.

Judge, may I just have a minute to confer with my colleagues?

THE COURT:  Yes, of course.

(Counsel conferred)

MR. BUCKLEY:  Your Honor, can we have a five-minute adjournment so that we can confer with movants' counsel?

THE COURT:  Of course.  We'll come back in five.

MR. BUCKLEY:  Thank you, Judge.

(Recess)

THE COURT:  Mr. Buckley.

MR. BUCKLEY:  Yes.  Thank you, your Honor, for giving me that opportunity to confer with my colleagues.

Upon further consideration, and as the Court rightly points out, since we're asking to hold them in abeyance while we pursue additional investigative techniques anyway, the government is prepared unilaterally to withdraw these subpoenas at this time.  And to the extent, as we noted at the outset of

Q7NHINRC

this proceeding, we determine, under *Gonzales* and its progeny, that it is appropriate and necessary to proceed with new subpoenas, we will come to the court in the first instance.

THE COURT:  All right.  Any objection from the movants?

MR. O'NEIL:  No objection, your Honor.

THE COURT:  All right.  And, Mr. Buckley, are you — Mr. O'Neil, I'll give you a chance to respond at the end of this.  Keep that in mind that I'll give you a chance to respond.

Mr. Buckley, are you overseeing this investigation moving forward?

MR. BUCKLEY:  Yes, your Honor.

THE COURT:  So moving forward, we're not going to have the types of issues that have plagued this case from the outset, fair?

MR. BUCKLEY:  Correct, Judge.

THE COURT:  All right.  You've referred in your papers to abiding by the policy as reflected in the regulation that we've been discussing, and do you pledge to follow that policy moving forward?

MR. BUCKLEY:  Yes, Judge.

THE COURT:  As well as the governing law that we've been discussing, including *Gonzales*?

MR. BUCKLEY:  Yes, Judge.

Q7NHINRC

THE COURT:  All right.  And that includes the provisions that we've been talking about; meaning, where we are in this proceeding, given the public disclosure and the discussions with the reporters and the notification, we're not going to have situations where, for instance, someone's watching *Sheep Detectives*, and FBI agents show up at their door, right?

MR. BUCKLEY:  Yes, Judge.

THE COURT:  I can't think of anything less — more inconsistent with *The Sheep Detective* than having an FBI agent show up at your door.  So that's not going to happen?

MR. BUCKLEY:  Correct, Judge.

THE COURT:  All right.

Mr. O'Neil, take it away.

MR. O'NEIL:  Thank you, your Honor.  I have a lot to say, a lot that I would like to say, but I'm actually going to be brief on this.

I think the government has said at various times today that there's no difference between holding in abeyance these subpoenas while it continues to conduct further investigations and having them quashed.  We fundamentally disagree with that.  There are critical First Amendment interests at stake here.  I believe it is very important that the record be clear and that the public know that the government is unilaterally withdrawing these subpoenas.

Q7NHINRC

The record here is replete with bad faith, and it's only become clearer today.  And so, given the chill that these subpoenas have already produced — and I refer you to paragraph 5 of the Eric Lipton Declaration — but I think it's clear that having this out there, having these subpoenas out there, has been damaging to the journalists, their ability to do their jobs, and the public's right to be informed about the conduct of its government.

So we, of course, have no objection to the withdrawal of the subpoenas, but I think it is important that this record be taken into account in any future effort.  I have every expectation that the government will not try again to issue subpoenas to these reporters in light of the bad faith that has characterized their efforts thus far.

THE COURT:  And to be clear, the Court will absolutely take into account all of the circumstances that the movants have raised in their papers to this point in considering any future application that's raised, and I'm sure the government understands that.

And when I asked Mr. Buckley about the regulations, the reason I asked those questions is because, as the movants have pointed out, the regulations are extremely detailed and have a number of provisions that are designed to safeguard the interests of the media and the press and reporters and ensure that subpoenas are a tool of last resort, and the movants have

made this point in their papers.  So that's why I had that colloquy with Mr. Buckley, because he is in charge, and he has indicated that the government will follow those regulations and the policy moving forward, even if there have been hiccups, to put it mildly, to this point.

So thank you, Mr. O'Neil.

Mr. Buckley, anything that you'd like to add?

MR. BUCKLEY:  Judge, I'm sure this will be no surprise, but we dispute any allegation of bad faith.  And I'll just leave it at that.

THE COURT:  All right.  Understood.

Now, more mundane matters, which is, is there anything else that we need to deal with in the current time?  We have a number of filings.  I think everything's reflected on the docket.  Is there anything that we need to do to either unseal further information or deal with anything else at this juncture?

MR. BUCKLEY:  Not from the government, Judge.

THE COURT:  Now, without going into the substance, I understand there was a letter submitted by the movants this morning, and they had indicated that the government had not responded to the movants.  Is the government going to respond to the movants?

MR. BUCKLEY:  We will, Judge.

THE COURT:  All right.  So you'll receive a response.

Q7NHINRC

And, Mr. O'Neil, if there's any further relief that you wish to seek from the Court, you know where to find us.

Anything else from either side?

Mr. O'Neil?

MR. O'NEIL:  Nothing.  Thank you, your Honor.

MR. BUCKLEY:  Not from the government.  Thank you, Judge.

THE COURT:  All right.  Very good.  We'll enter an order reflecting what we discussed here.  The Court will retain jurisdiction over any proceedings relating to these subpoenas or any subpoenas that are related.

Mr. O'Neil, what I'll ask you to do is submit a letter on the jurisdictional point regarding what the scope of that should be in light of the authority that was referenced by the government.  If you could submit that by Monday, that would be great, and then we'll decide whether the order that we put in needs to be modified in any respect.  The parties should order a copy of the transcript.

Anything else?

Very good.  We are adjourned.

MR. BUCKLEY:  Thank you, Judge.

MR. O'NEIL:  Thank you.

(Adjourned)